## Harris v. Commonwealth.

(Decided May 28, 1926.)

### Appeal from Christian Circuit Court.

1. Homicide—Manslaughter Instruction Held Not Required, in Prosecution for Killing of Defendant's Wife, Where Circumstances Indicated that Defendant was Either Guilty of Murder or Innocent.—Manslaughter instruction held not required, in prosecution for killing of defendant's wife, where evidence was largely but not entirely circumstantial; there being no eye-witnesses, and circumstances indicated either murder or innocence.

2.  Criminal Law—Refusal of Continuance, on Ground that Defendant had Not had Time to Prepare Case, Held Not Prejudicial, Where it did Not Appear that Defendant Could Better His Defense if Time were Granted.—Refusal of continuance, on ground that defendant had not had time to prepare case, held not prejudicial, where affidavit did not show anything that defendant could do to better his defense if time were granted.

3.  Criminal Law—Refusal of Continuance, on Ground that Defendant was Forced in Trial Court Without Witness to Testify for Him, Held Not Prejudicial, where it did Not Appear that he had Any Witnesses.—Refusal of continuance, on ground that defendant was forced in trial court without witness to testify for him, held not prejudicial, where it was not shown that any winess could be found if continuance were granted.

4.  Criminal Law—That Juror, After Trial, Said he Heard Defendant Killed Wife Because She Knew he had Killed Another, Held Not Ground for Reversal of Conviction, in View of Affidavit.—That juror, after trial, said he heard defendant killed wife because she knew he had killed another, held not ground for reversal of conviction, where juror filed affidavit that he heard such statement after conclusion of trial.

5.  Criminal Law—Refusal of New Trial on Ground that Defendant Would be Able to Employ Counsel Held Not Prejudicial.—Refusal of new trial on ground that defendant would be able to employ counsel held not prejudicial, where he had been properly represented by counsel appointed by court.

6.  Criminal Law—Refusal of New Trial, on Ground that Defendant Could Procure Many Witnesses to Testify for Him, Held Not Prejudicial, where their Names or Evidence were Not Set Out.—Refusal of new trial, on ground that defendant could procure many witnesses to testify for him, held not prejudicial, where their names or whereabouts were not given, and their evidence not set out.

7.  Criminal Law—Court of Appeals Cannot Review Trial Court's Alleged Error, in Allowing Juror, who had Formed Opinion, to Sit in Case (Criminal Code of Practice, Section 281).—Court of Appeals cannot review trial court's alleged error, in allowing juror, who had formed oinion, to sit in case, in view of Criminal Code of Practice, section 281, especially where it was not shown that he could not have been removed by peremptory challenge.

WALTER ROBINSON for appellant.

FRANK E. DAUGHERTY, Attorney General, and G. D. LITSEY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Affirming.

The appellant, whom we will call defendant, is asking for the reversal of a judgment imposing upon him the

death penalty for the murder of his wife. This woman was killed on the evening of April 29, 1925. Two women living in a neighboring house testified that the last they saw of this woman alive was a little before sundown. She was getting a bucket of coal. The defendant came home, walked up to the porch, and she said to him, "Where have you been all the evening?" He didn't make any answer, and he and his wife went into the house. A short time after that, they heard something fall in the house. They said it sounded like something heavy fell on the floor. About an hour after that, they saw John Manson at the rear of the house. One of them said to him, "I don't think there is anybody there." He answered, "Yes, there is; they will turn me in in a minute." On Friday, May 1, some partially burned rugs were found with blood on them. These rugs were identified as belonging in the Harris home. Blood stains were found in the Harris home. On May 7, the body of Leona Harris was taken from the river near Hopkinsville. The body was fastened in a tub with rope and wire, heavy weights had been attached to the tub by which the tub and body had been sunk to the bottom of the river. A light dress and some undergarments were on the body, and stockings, but no shoes. A sheet was wound around the body and a quilt around that. The feet and head were wrapped in burlap sacks. This woman had been missing for several days, and on the evening of May 6th, defendant, Sam Harris, and John Manson, a man who worked for defendant, and frequently took his meals there, had been arrested.

On the morning of May 7th, Manson told the officers that on the evening of April 29th, he had bought some onions to take to the house for them and had started to the house with the onions when he met defendant Harris up town; at the direction of Harris, he left the onions in a barber shop and at Harris' invitation, he got in a machine with him and was driven to the home of Harris' mother. Harris talked to his mother for a while, and they were driven back to a point near his home. They got out of the car, and the two started to his house. It was then getting dark. They did not go in, but stood there about five minutes, then went back, got into the car and were driven to Fourth and Clay streets, where they got out. They then went up town, stood around a few minutes, and then went back to the Harris home. Manson said Harris told him to go to the back door, and he would

let him in directly. Harris went to the front door, entered it, pulled the middle door to, and in a few minutes let Manson into the back room. While Manson was standing at the back door, he said the witness Betty Hopper told him that she did not think there was anybody at home, and he told her that there was, and they would let him in in a few minutes, which was done. Harris said something about having supper, then he said, "We will get some tomatoes." Manson said that at direction of Harris he went out the back door and Harris went out the front way. Harris looked up and down the railroad track, and looked around his premises, then suggested that they go back home, which they did, and Manson was again admitted through the back door. The middle door was open this time. When Manson came in the back door, Harris locked it, and then went into the front room, and locked that door. He said to Manson, "Come in here." Manson went in the front room and saw the body of Harris' wife wrapped up in some bed clothing. He said that Harris said to him, "You come and help me carry this off." Manson says he replied, "You will get me into a world of trouble. What did you kill her for?" Harris said, "You don't know." He says Harris got two grass sacks, split one of them; put one around her feet and one around her head. He took a rope and tied her body up and put it in a tub and fastened it in with wire, and told Manson to catch hold of the tub. Manson says he started crying, and Harris said, "What in the hell are you crying for?" He said Harris had a pistol and made him take hold of the tub and the two of them carried the tub containing the body of the dead woman to the river, where Harris attached some weights to the tub and threw the tub and body into the river. He said that when he objected to helping carry the tub, Harris told him he would kill him if he didn't. Early the next morning, these two men went back to this Harris home and Manson says that at the direction of Harris, he wrote this note: "Gone to Trenton; will be back at eight o'clock. Leona." Harris put this note in the window and put a rock on it. When they left the house next morning, they met a neighbor girl, Louise Pankey, whom Harris told that his wife had gone to Trenton. On Tuesday, May 5, Harris moved his things out of his home. On May 6, Harris, Manson, and Harris' sister, had started to Dawson Springs and on their way they were arrested. He said that Harris told him he would kill him if he told any-

thing and that after putting the body in the river, Harris would not let hm get away from him at all, but stayed with him. Manson told the officers where they would find the body of the dead woman, and followiing his direction, the body was found. This woman had been killed by a blow upon the left side of her head, about the eye, and her neck was broken. After Harris was arrested he told the officers that he did it, and seemed much excited; but after a moment he regained composure, and said he did not know anything about it. He then told them that on that Wednesday evening, April 29th, Manson and his wife were playing, and that Manson struck Leona on the head with a stick with an iron tap on the end of it; he said, "I saw she was dying, and ran for a doctor. I tried to get Dr. Moore, but did not find him. When I got back, Manson told me he had put her body in a tub and put her in a wheelbarrow and hauled her to the river and thrown her in." When asked why he did not report that to the officers, he said, "I thought she had gone to Trenton." He said that when he got back that night and found his wife gone, he got in Mose Perkins' taxi and was driven around for about an hour looking for her. Perkins was introduced as a witness, and denied this.

Smith Boyd, who was confined in jail with Harris, said that he asked Harris who killed his wife and Harris said he did, and that he hit her with a plank over her eye. Of course, Harris denied this statement. Twenty-four witnesses were introduced by the Commonwealth and by them an array of circumstances was established that strongly indicated that Harris was guilty.

The court gave to the jury three instructions. The first was murder instruction; in the second instruction the court old the jury that Harris could not be convicted upon the testimony of Manson unless corroborated by other evidence tending to connect Harris with the commission of the offense, and that what Harris might have said in the way of a confession would not warrant a conviction unless accompanied with other proof that such an offense was committed. The third instruction was a reasonable doubt instruction.

Defendant in his brief cites the case of Rachford v. Com., 16 Rep, 411, 28 S. W. 499, and Rutherford v. Com. 13 Bush 608, and insists that the court erred in not giving to the jury a manslaughter instruction. In both those cases the evidence was entirely circumstantial, and in both of those cases the court said that where the evidence

was entirely circumstantial, the court should give the law applicable to murder, manslaughter and self-defense; but the evidence in this case is not entirely circumstantial. The defendant himself took the stand and undertook to tell how his wife was killed and claims that John Manson killed her.

In the case of Frasure v. Com., 169 Ky. 627, 185 S. W. 146, there was no eye-witness to the killing, except Frasure, who testified that he and deceased had been attacked by ruffians, who killed deceased and wounded Frasure. The court said that the record left room for no theory other than murder or innocence, and that manslaughter and self-defense instructions were not required, though most of the evidence was circumstantial, and there was evidence of a struggle. The matter is discussed in that case with such learning and elaboration that it can not be improved upon, and we shall not attempt to do so. That case is conclusive of the question raised by defendant.

The defendant has filed nine other grounds for a new trial, in none of which, however, can we find any merit. The first one is that he should have had a continuance because he had not had time to prepare his case; but there is not in the affidavit any suggestion of anything that defendant could do or contemplated trying to do to better his defence if the time were granted. He was represented in the trial court by two attorneys appointed by the court, one of whom was a young man, but the other was an attorney of considerable legal experience, and we can not say, after an examination of this record, that he was not properly represented. His case has been briefed in this court by yet a third attorney and his present sad predicament is not the result of any lack of counsel.

His second and third grounds are practically the same as the first, and what was said about the first applies to those.

In his fourth ground he said he was forced into trial without a single witness to testify in his behalf, but there is no suggestion that by a continuance of the case, any witness in his behalf could have been found.

In his fifth ground he says that one member of the jury said the next morning after the trial, "I have heard that Sam Harris had killed a colored man and thrown him in the river, and that the reason he killed his wife was because she knew it, and he was afraid of being exposed." He doesn't say when the juror heard this, and

the juror filed his affidavit that he heard that after the conclusion of the trial.

In the sixth ground he said that if granted a new trial he would be able to employ counsel, but we can not see that employed counsel could have rendered any better service than was rendered him by the counsel appointed by the court. He also suggests in this ground that he could procure many witnesses who could testify for him, but does not offer to give the names or whereabouts of any of them, or what they would say.

In the seventh ground he says the court erred in permitting one juror to sit in the case after this juror had said that he had an opinion which it would take evidence to remove; but we can not review that. See section 281, Criminal Code. Moreover, there is no suggestion that the defendant could not have removed this juror, by a peremptory challenge, if he wanted to do so.

His eighth and ninth grounds are alleged errors of the court in admitting and rejecting evidence; but we find this record remarkably free from such errors. In fact, it was so free from errors of this character that the defendant's counsel was unable to cite any such error in his brief. After a careful consideration of this case, we can find no prejudicial error in it, and the judgment is affirmed.

The whole court sitting.