## Brannon v. Commonwealth.

(Decided June 18, 1926.)

### Appeal from Fayette Circuit Court.

1. Indictment and Information—Defects, if Any, in Indictment, Held Waived, where Motion to Quash was not Made Until After Continuance had Been Granted and Case had Been Called a Second Time for Trial (Ky. Stats., Section 2244; Criminal Code of Practice, Sections 157, 281).—Any defects in an indictment because a grand jury returning it was not summoned and impaneled in accordance with Kentucky Statutes, section 2244, held waived, in view of Criminal Code of Practice, sections 157, 281, where motion to quash was not made until after continuance had been granted and case had been called a second time for trial.

2. Indictment and Information—Indictment in Five Counts, but Charging Only One Crime, Various Counts, Stating Different Ways in which it was Claimed Murder was Committed, Held Not Bad for

Duplicity.—Indictment which was in five counts, but only charged one crime, that of murder, was not demurrable for duplicity because its various counts stated different ways in which it was claimed that murder was committed.

3. Criminal Law—Error, if Any, in Admitting Conversation with Alleged Co-conspirator Tending to Show Conspiracy, Because Defendant was Not Positively identified as present, Held Not Prejudicial, where Conspiracy was Abundantly Proven by Other Evidence (Criminal Code of Practice, Section 340).—In prosecution for homicide, committed during conspirary to rob, if any, in admitting conversation by witness with co-conspirator, which merely tended to establish that a conspiracy existed, because defendant was not positively identified as being present, held not prejudicial, in view of Criminal Code of Practice, section 340, where conspiracy was abundantly established by other evidence.

4. Criminal Law—Admission of Blood-Stained Overcoat, in Homicide Prosecution, Held Not Reversible Error, where Defendant Admitted his Ownership and Attempted to Explain Presence of Blood Stains.—Admission of blood-stained overcoat, in homicide prosecution, held not reversible error, where defendant, on stand, admitted that overcoat was his and attempted to explain presence of blood stains.

5. Homicide.—In prosecution for homicide, committed during robbery, instruction on involuntary manslaughter held properly refused, under evidence.

6. Homicide.—Where facts in murder prosecution did not justify charge of manslaughter defendant cannot complain of charge thereon to his advantage.

7. Homicide.—Evidence held to sustain conviction of murder, committed during robbery.

HARRY B. MILLER for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

The appellant, Roger Brannon, was convicted of the murder of William Nelson Fant, and received the penalty of death. From the judgment he appeals.

About five o'clock of the evening of December 26th, 1925, a number of men, among whom was Fant, had gathered together in an upper room of the Paramount Hotel in Lexington, Kentucky. For a long time previous to this day, a handbook and poker game had been conducted in this room and these men, on this occasion, had assembled for the purpose of and were playing in the poker game. Just back of this room where these men were thus engaged was a large sized bathroom with a number

of toilets in it. The dealer of the game on this day was one Clifford Hall, known in this record as "Pipe" Hall. Just about five o'clock a knock was heard on the outer door and one of the attendants in the room opened it to see who it was. He was confronted by two men with drawn pistols, who backed him into the room, and who commanded all present to hold up their hands. This command was promptly obeyed. These two men then compelled those present to kneel on their knees against and facing the wall with their arms up and their hands to the wall. One of these men, whom it is conceded was Raymond Davis, then busied himself with robbing the box in which the money which had purchased the poker chips was kept. The other man, identified by the Commonwealth's witnesses as the appellant, guarded the occupants of the room and saw to it that they kept their arms up and their faces to the wall. While so doing he noticed on Fant's finger a handsome diamond ring. He commanded Fant to "give up the hoop" and when Fant did not promptly do so he jerked the ring from Fant's finger. By this time Davis had secured such cash and other valuables as he could find in this front room and he then passed back into the bathroom. Fant was then commanded by the man identified as Brannon to rise and go into the bathroom; which he did. As he passed into the bathroom he was searched for and relieved of all money and valuables. He was then placed in one of the toilets. The next man summoned for like treatment was Pipe Hall, a confessed accomplice of the two robbers and the inside man on this job. The search made of him was entirely superficial. The next man summoned for such search was R. L. Sullivan. After he, too, had been searched and relieved of his valuables and ordered into another one of these toilets, and while the man identified as Brannon was summoning the next person for search, Fant emerged from the toilet where he had been placed and noticing that Davis was off his guard, seized him. A terrific struggle at once ensued between them for the possession of the revolver which Davis had in his hand. Both Fant and Davis called for help. Sullivan, who was standing near by, observed all that went on in the bathroom but did not go to the aid of Fant, nor did any one of the occupants of the front room go to his assistance as they were all cowed by the man identified as Brannon. This man then began to run back and forth between the front room and the bathroom where Davis and Fant were

struggling in the endeavor to keep the men in the front room cowed and to render what assistance he could to Davis in the bathroom. In the course of these trips, he hit Fant several times over the head with a revolver he was carrying. While Davis and Fant were struggling, Davis' gun was discharged and Davis was wounded severely in the arm. When this gun was fired, the man identified as Brannon, then in the front room, rushed back into the bathroom firing his revolver a couple of times as he did so. About this time Davis had gotten behind Fant but was held by Fant close to the latter's body; both of them facing the same way, and both of their right arms being then stretched upward and interlocked in the struggle for the gun. While they were in this position the man identified as Brannon ran up to them and raising the gun which he had as high as he could and placing it against the left breast of Fant fired downwards, evidently in the effort to kill Fant, but to avoid having the bullet go through Fant and hit Davis. The bullet, fired from a 38 special, ranged downward through the heart sac, piercing the body entirely and was later found in Fant's shirt. Fant released his hold on Davis and the two bandits rushed from the room and building pursued by some of the occupants. Fant walked from the bathroom into the front room and there fell dead. The two bandits, when they reached the street, fled across the intersection of Main and Limestone streets to the sidewalk near the United Cigar Store and thence up to Short street, where they separated. They were pursued by a large crowd. Davis was in advance, and the crowd did not at first realize that his companion was also fleeing, but thought that he was a pursuer instead of a pursued. Indeed, one of the witnesses testified that the man identified as Brannon, when asked by the witness whom the crowd was chasing, answered: "There he goes," pointing to Davis. When the two bandits separated, the crowd pursued Davis. The man identified as Brannon turned east on Short street in the direction of the Lexington Herald office. He was, however, pursued by Roy Jennings, a police officer, in an automobile, who followed him to Walnut and Short streets. There just back of the Lexington Herald office, at Barr and Walnut streets, Jennings caught Brannon. When thus arrested Brannon gave the name of Tom Brown, which name he continued to assert was his until long after he had been slated as a prisoner in the jail. After his capture Brannon was immediately taken to the

room in the Paramount Hotel where Fant lay dead. A great many of those present testified that Brannon on seeing Fant asked: "Is the man dead?" but Brannon denied making this statement. On being searched at the jail nothing was found on Brannon, but the next morning underneath a tree in a yard close by the place where Brannon was captured there was found a 38 special revolver which had been fired; further, on this next day, there was found hidden in the fringe of a muffler which Brannon had removed from his throat as he walked along with the officer from the place of his capture to the Paramount Hotel and had placed in the pocket of an overcoat he was then wearing, Fant's diamond ring. The appellant was positively identified by Sullivan and a number of others as the man who accompanied Davis in the holdup above described. In addition to the foregoing facts, the Commonwealth also proved by Pipe Hall that, about two o'clock on the afternoon of the holdup, he met Davis and a man whom he said on direct examination was Brannon, in an automobile near the viaduct which crosses the railroad tracks by the Lafayette Hotel. Hall further testified that he was there asked by Davis in the presence of Brannon how much money would be in the box that afternoon, meaning thereby the box in the gambling room in the Paramount Hotel where the money which bought poker chips was kept. Arrangments were then made by Davis and Hall for Hall to let Davis know later on in the afternoon should the prospects be not propitious for the proposed holdup which later took place. It is true that Hall on cross-examination weakened much in, if he did not deny, his identification of Brannon on this occasion. The foregoing facts were established by the Commonwealth and none of them were disputed or contradicted by the appellant except those establishing the fact that he was Davis' companion on the occasion of the holdup or the occasion of the automobile conversation earlier in the day. As to this, Brannon's claim was this: Just after his graduation from high school some two or three years previous to this holdup he had been convicted of the crime of burglary in Hamilton, Ohio, but was given a suspended sentence, with the proviso that he should remain out of Hamilton. He thereupon went to Covington and engaged in the real estate business. There he met one Irene Perkins, with whom he became unduly intimate. On Christmas day, 1925, he visited his mother in Hamilton, as he had a right to do under his suspended

sentence. On the morning following Christmas day he received a telephone message that Irene Perkins, who was then, according to the appellant, within a month of her expected motherhood, desired him to come to Covington to take her over to Winchester, Kentucky, for the purpose of finding her cousin, Beulah Thomas, in order that the latter might be with her during some operation. Just the character of this proposed operation was never brought out in the evidence, but the fair inference is that it was an illegal operation. Responding to this message appellant went to Covington and there met Herbert Moore and Chick Daniels and with them and Irene Perkins drove to Winchester, Kentucky, in an automobile, arriving there about two o'clock in the afternoon. There they separated, he and Moore going to a restaurant to get something to eat while Irene Perkins and Daniels rode around hunting for Beulah Thomas. They were unsuccessful in their search and the four reassembled about four o'clock in the afternoon for the purpose of going to Lexington, where they say Beulah Thomas was working in a five and ten cent store, as they had heard in Winchester. They arrived in Lexington about 4:30. Irene Perkins complained of being deathly ill and requested that she be taken to the Phoenix Hotel for rest. The men left her there and then rode around the central part of the city hunting for a place in which to park their car. Having found a place and parked their car, they separated with the agreement to meet again at the car at five o'clock. Appellant then went to one of the five and ten cent stores for the purpose of finding Beulah Thomas but was unable to do so. As he was on his way back to the parked automobile, he was arrested. Meanwhile Irene Perkins became more and more ill but as her condition was illegitimate she was unwilling to call in a Lexington physician and she implored her other companions to take her back at once to Newport where she knew a physician who would give her relief. For this reason Moore, Daniels and Irene Perkins left Lexington without making any inquiry as to what had become of appellant. Appellant denied ever having been in the Paramount Hotel or knowing anything about the murder. He said that he gave the name of Tom Brown when arrested in order to save his mother the pain and humiliation of hearing that her boy was again in trouble. The appellant undertook to establish the foregoing facts of his side of this case by his own testimony and his affidavit of what Moore, Daniels and

the Perkins woman, the two former of whom the sheriff was never able to find and the latter of whom failed to show up at the trial, would say if present, which affidavit was allowed to be read as the despositions of these absent witnesses.

The first ground relied on for a reversal in this case is that the appellant's motion to quash the indictment herein should have been sustained because the grand jury which returned the indictment was not summoned and impanelled in accordance with the provisions of section 2244 of the Kentucky Statutes. Even if appellant be correct in his premise, we are precluded from examining into this question for two reasons: First, section 281 of the Criminal Code provides that the decisions of the trial court upon motions to set aside an indictment shall not be subject to exception; secondly, section 157 of that Code provides that a defendant, upon arraignment, must either move to set aside the indictment or plead thereto. In this case the motion to quash the indictment came long after the appellant had been arraigned. There was possibly some excuse for his not making the motion on his arraignment because it came unexpectedly to him and when his counsel was absent without fault on the part of either of them. But appellant did not make this motion when his case was before the court next after the date of his arraignment and when his counsel was present and defending for him. On the contrary, appellant on this occasion procured a continuance of this case, and this motion to quash was not made until the case was called a second time for trial. In Sloan v. Commonwealth, 211 Ky. 318, 277 S. W. 488, Sloan was making the same contention about the quashing of an indictment because of error in the impanelling of the grand jury which returned it, as is appellant here. Sloan's motion came long after his arraignment, and we there pointed out that because the motion was not made at the time of the arraignment, it came thereafter too late, and the error, if any, was waived. We also pointed out that under section 281 of the Criminal Code, we were precluded from examining into the correctness of the lower court's ruling on such a motion. The Sloan case is conclusive of the first point here raised by appellant.

The next ground urged for reversal is that the demurrer to the indictment should have been sustained because of duplicity. The indictment is in five counts, but it only charges one crime, that of murder. The various

counts in the indictment merely state the different ways in which it is claimed that murder was committed. The third count, of which particular complaint is made, does not charge the accused with the crime of conspiring to rob as appellant claims, but only with the crime of murder committed in the execution of a conspiracy to commit a felony, to wit, the crime of robbery. In Anderson v. Commonwealth, 144 Ky. 215, 137 S. W. 1065, the appellant was indicted for the crime of murder. The indictment contained six counts. The opinion says:

"In the first count, all of them were charged as principals. In the second count it was charged that the accused, together with persons to the grand jury unknown, entered into a conspiracy with each other, and went forth armed and disguised in pursuance of such conspiracy for the purpose of killing and murdering Carroll, and pursuant thereto, and in furtherance of said conspiracy and while the same existed, they each, with the knowledge, consent, and agreement of the other and with others whose names are unknown, shot and killed him. The third count charged that appellant did the shooting, and the other accused were present as aiders and abetters. The fourth count charged that Woosley did the shooting and that appellant and Ashley aided and abetted. The fifth count charged Ashley did the shooting and that the others aided and abetted. The sixth count charged that some person whose name was unknown to the grand jury did the shooting, and that appellant, Woosley, and Ashley were present aiding and abetting; and, further, that these accused, together with other persons whose names were unknown to the grand jury, went forth armed and disguised, and in pursuance of a conspiracy which they formed to whip Del Carroll and others, and in furtherance of said conspiracy and agreement one of the conspirators whose name is to the grand jury unknown did unlawfully, willfully, maliciously and feloniously kill Carroll."

Anderson contended that his demurrer to this indictment should have been sustained because of duplicity. It will be noted that one count in that indictment charged that the murder had been committed in the execution of a conspiracy to commit a felony, that is, a conspiracy to go

forth armed in the night time for the purpose of whipping certain individuals. In this case, the third count charges the murder to have been also committed in the execution of a conspiracy to commit a felony—the crime of robbery. Thus essentially the two cases are the same. In disallowing Anderson's contention, we said:

"It is well settled that an indictment may charge the commission of the offense in different modes and manners and in as many counts as the pleader desires to present it. Commonwealth v. Hargis, 124 Ky. 356, 99 S. W. 348, 30 Ky. Law Rep. 510. It sometimes happens that the grand jury that finds an indictment does not know with certainty the manner or mode in which the offense for which the indictment is found was committed, but they have sufficient evidence to identify the person charged in the indictment with its commission. And so in such cases it is proper practice for the indictment to charge in separate counts different modes or manners in which the offense was committed. And, if upon the trial of the case the Commonwealth can establish that the accused committed the offense in the manner and form described in any one of the counts that is sufficient, a conviction may be had. . . . When an indictment is thus drawn, presenting sufficiently in each count every aspect of the case in which from the evidence before the grand jury, the crime might have been committed, the accused cannot say that the indictment did not furnish him information as to the mode or manner in which the offense was committed, and he may be convicted upon evidence showing his guilt under any of the counts . . . Therefore, the court did not err in overruling the demurrer to the indictment."

This Anderson case is conclusive of appellant's second point.

It is next contended that the court admitted incompetent evidence for the Commonwealth. Three items are complained of particularly: First, it is said that the court admitted evidence of some conversations between Davis and others which took place in the Lafayette Hotel prior to the homicide without it being proved that appellant was present and without any proof establishing or tending to establish that a conspiracy then existed

between him and these others. Appellant's counsel is in error about what the record shows in this connection, for we find no evidence in this case about any such conversations which was allowed to go to the jury. The court carefully excluded all that evidence.

Secondly, appellant says that the evidence of Hall as to the conversations between him and Davis which took place by the automobile when it was standing in the early afternoon of the homicide near the viaduct by the Lafayette Hotel should have been excluded since Hall did not positively identify appellant as one of those present, and there is no evidence in the record to show that a conspiracy then existed between Davis and appellant. It is true that Hall's identification of appellant as one of those present on this occasion was very weak and was much shaken on cross-examination, yet near the end of his testimony, he came out with a positive statement that appellant was present at that time; further, the facts immediately surrounding the homicide indisputably established a conspiracy on the part of the two men who held up this room in the Paramount Hotel to rob by violence those present, and the evidence was very clear that appellant was one of these two men. The conversations by the automobile earlier in the afternoon only went to establish that a conspiracy of which appellant was a member existed to rob this hotel room, and, as stated, this was abundantly established by other evidence. The admission of this conversation, then, even if it be conceded that it should have been excluded, was not, under the facts and circumstances of this case, such an error as prejudiced any substantial rights of appellant. Criminal Code, section 340 .

Thirdly, appellant says that an overcoat upon the sleeve of which were some blood stains ought not to have been allowed to be introduced in evidence and shown to the jury. In his brief appellant says that his objection to the introduction in evidence of this overcoat was based on the ground that the overcoat was not shown to belong to him, but, on the contrary, was affirmatively shown by the Commonwealth to be the overcoat of Davis. Some suggestion is also made that it was not shown that the overcoat when introduced was then in the same condition it was when taken from the appellant, if it was.

When the witness John L. Sellers was on the stand, he identified an overcoat shown him as one which he had taken to Dr. L. A. Brown for examination for blood

stains and which had been returned to him by Dr. Brown after the examination. When it was sought to introduce this overcoat in evidence in connection with Dr. Brown's testimony, appellant objected and the court tentatively permitted its introduction on the avowal of the Commonwealth that it would later show that the overcoat belonged to the appellant. This the Commonwealth did by the testimony of officer Joe Harrigan who identified the coat in question as the same one which he took off of Brannon when Brannon was first brought to the police station after his arrest by officer Roy Jennings. Harrigan also testified that he kept this overcoat in his locker at the police station until he delivered it to the witness Sellers, and that it then was in the same condition as it was when he took it from Brannon. The witness Maloney testified that when Brannon was brought to the police station, as above stated, there was blood on the back of Brannon's hand and also on the sleeve of his overcoat. Appellant himself, when he took the stand, admitted that the overcoat in question was his, admitted there was blood on his hand at the time of his arrest but could not recall whether there was blood on the sleeve of the coat at that time. He said that the blood on the sleeve must have gotten there when he brushed against Davis at the station house. He explained the blood on his hand by a claimed rough treatment on the part of the officers at the time of his arrest. Thus it is perfectly plain that the overcoat about which appellant is complaining belonged to him and was at the time of its introduction in evidence in the same condition in which it was when taken from him at the time of his arrest.

An overcoat identified by officer John Fenley as the one he took from Davis when he arrested him was introduced in evidence without objection, on the part of the appellant, as the record affirmatively shows. Appellant confuses this overcoat with the one identified by Harrigan, Maloney and Sellers, and being so confused he argues that the Commonwealth affirmatively established that the overcoat complained of was that of Davis and did not belong to appellant. Even if this be so, which it is not as we shall presently see, appellant may not now complain of its introduction since the overcoat identified by Fenley was introduced without objection on the part of appellant and he never thereafter moved the court to exclude it from the consideration of the jury. But the confusion is apparent and not real. A careful reading of

the record demonstrates that there were two overcoats in evidence. Brannon's overcoat had already been introduced in evidence, tentatively to be sure, yet introduced, when Fenley took the stand. He had nothing to do with Brannon's arrest. If the overcoat he was called upon to identify was that of appellant, there was no need to introduce it in evidence because Brannon's overcoat had already been introduced. If the overcoat shown Fenley was a different one from that which had thertofore been introduced, it was incumbent on the Commonwealth to introduce it if the Commonwealth wished it considered by the jury. And this the Commonwealth did. The appellant is not entitled to any reversal because of the admission of testimony.

The next contention of appellant is that the instructions were erroneous because the court failed to give an instruction on involuntary manslaughter. He relies on the case of Rutherford v. Commonwealth, 13 Bush 608, and kindred cases. However, as pointed out in Harris v. Commonwealth, 214 Ky. 787, 283 S. W. 1063, this line of cases is applicable only when the evidence is entirely circumstantial. Such was not the case here. The facts left no room for an instruction on involuntary manslaughter, and it is doubtful if even a manslaughter instruction should have been given at is was. But this was to appellant's advantage and he may not complain of it. Under the Harris case *supra* and Frasure v. Commonwealth, 169 Ky. 620, 185 S. W. 146, the court did not err in failing to give an instruction on involuntary manslaughter.

Lastly it is contended that the verdict is flagrantly against the evidence. The statement of the facts of this case set out in the beginning of the opinion is a complete refutation of this contention.

Thus, we see that none of the grounds relied upon for reversal possesses sufficient merit to bring about that result. The penalty imposed upon appellant is the most severe one known to the law. But if he was the one who committed this homicide he may not well complain of the penalty he has received. The question of whether appellant was the one who shot Fant or not was duly submitted to the tribunal provided to decide such issue. It has decided it against him and its verdict is abundantly supported by the evidence. The judgment is therefore affirmed.

Whole court sitting.