## Alder v. Commonwealth.

(Decided June 25, 1926.)

Appeal from Bell Circuit Court.

1. Criminal Law.—Failure to object to evidence when offered precludes complaint on appeal.

2. Criminal Law—Admission of Letter, Handwriting on which was Identified by Person Familiar Therewith, Held Not Error; Statute being Inapplicable (Ky. Stats., Sec. 1649).—Admission of letter, handwriting on which was identified by person familiar therewith, held not error, Kentucky Statutes, section 1649, being applicable only where genuineness of handwriting is sought to be proved by comparison.

3. Witnesses.—Defendant held not entitled to object that his counsel, formerly city attorney, was required to testify for Commonwealth as to investigation conducted by him.

4. Criminal Law—Testimony that Attorney Saw Record of Express Shipment of Suit Case in Defendant's Name Held Not Reversible Error; Defendant Having Admitted Shipment.—In prosecution for

murder, admission of testimony by former city attorney that in course of investigation he saw record of express shipment of suit case in defendant's name held not reversible error; defendant having admitted and attempted to explain the shipment.

5. Criminal Law.—In prosecution for murder, admission in evidence of photograph of deceased held not prejudicial.

6. Homicide—Exclusion of Evidence as to Apparent Age and Appearance of Man Near where Deceased's Body was Found Held Not Error.—In prosecution for murder of defendant's wife, where defendant testified that his wife left him with another man, whom he described, it was not error to exclude testimony of witness, who found decedent's body in river, affecting the age and appearance of a man who was nearby, and who disappeared immediately on discovery of the body.

7. Criminal Law.—Court's remark that admonition to jury that certain testimony could be considered only to impeach or contradict certain witnesses was made for benefit of accused, and would be withdrawn, if objectionable, held not error, where made in response to objection of his counsel.

8. Criminal Law.—In prosecution for murder, exclusion of certain handwriting exhibits, offered for purpose of showing by comparison identity of writer of letter, held not error, in view of Kentucky Statutes, section 1649.

9. Homicide.—In prosecution for murder of defendant's wife, evidence that deceased's general reputation for virtue and chastity was bad held properly excluded.

10. Homicide.—In prosecution for murder of defendant's wife, testimony of a prior assault upon her by one whom witness believed to be defendant held properly admitted.

11. Criminal Law—Court's Admonition Following Reading of Two Depositions Held Not Prejudicial as Authorizing One First Read to be Disregarded.—Court's admonition, following the reading of two depositions telling jury to consider "this deposition" as if witness were testifying in person, held not prejudicial as equivalent to saying jury should disregard first deposition.

12. Criminal Law—Excluding Evidence that Nonresident Witnesses Received Expenses and Fee in Addition to Payment for Time Spent in Attending Trial Held Not Error, where Evidence Showed Witness had Refused to Attend Trial Unless Paid for His Time.— Where court admitted evidence that particular nonresident witness had refused to attend trial, unless some one paid him for his time, which was done, exclusion of further evidence that witness and his wife received their traveling expenses and usual witness fees held not error.

13. Homicide.—Where evidence of murder is purely circumstantial, manslaughter instructions are properly given.

14. Criminal Law.—Judgment of Conviction will not be reversed for insufficiency of circumstantial evidence, unless verdict is palpably against the evidence.

15. Criminal Law—In Prosecution for Murder, Court's Use of Expression "With a Blunt Instrument," in Instruction Held Not Error,

in View of Proof of Nature of Wound Inflicted.—In prosecution for murder, where there was evidence that deceased's skull had been broken in a V-shape, court's use of expression "with a blunt instrument" in instructions held not erroneous.

16. Homicide.—Manner of killing need not be proved, nor is mere possibility of other cause of death sufficient to overcome facts leaving no rational grounds for doubt.

17. Homicide.—In prosecution for murder of defendant's wife, evidence held sufficient to go to jury.

18. Criminal Law.—That officers in charge of jury, both of whom were sworn and admonished, exchanged places several times without being newly sworn held not misconduct, requiring new trial of murder case.

19. Criminal Law.—That juror talked to some person in presence and hearing of sheriff in charge of jury on matter not related to trial, held not to show misconduct entitling defendant to new trial.

20. Criminal Law.—In prosecution for wife murder, argument comparing case of assassination of Presidents Garfield, Lincoln and McKinley held not improper.

21. Criminal Law.—Defendant's statement, without proof by bill of exceptions, that during argument court vacated bench and left court room held insufficient to warrant new trial.

22. Criminal Law.—Alleged errors relative to misconduct of judge, jury or Commonwealth's Attorney must be embodied in bill of exceptions to be reviewable.

23. Criminal Law.—The quantum of proof of venue required is not extensive.

24. Criminal Law.—Evidence of finding of deceased's body in a wash on the bank of a river in particular county held sufficient evidence of venue.

25. Homicide.—Evidence held to sustain conviction for murder.

26. Criminal Law.—Newly discovered evidence held insufficient to entitle defendant to new trial, in view of want of diligence shown, and the likelihood that result would be unchanged.

JAMES S. GOLDEN for appellant.

FRANK E. DAUGHERTY, Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

The appellant, whom we shall call the defendant, was indicted for the murder of his wife, Maggie Alder. He was convicted, and his punishment fixed at confinement in the penitentiary for life. Late in the afternoon of July 9, 1918, the dead body of a human being was found on the east bank of the Cumberland river, near the city of Pineville. The hair had slipped off of the head, the flesh had fallen away from the face and skull, and the body was in such a state of decomposition that it was im-

possible, from a view of the body, to tell who it was, or in fact, to tell whether it was a man or a woman, except from the hair and clothing. By means of the clothing, the teeth, some bridge work on some of them, an engraved ring taken from one of the fingers, and some of her hair, this body was identified as that of Maggie Alder. A witness who saw and examined the body said: "One side of her head, about the temple or thin part of the skull, was broken in, in kind of a 'v' shape. It was considerably crushed."

Maggie Alder, *nee* Maggie Washburn, had formerly lived at Hazard, Kentucky. Some years before, she had married a Mr. Higgins, who joined the army, and in 1917 went to France. There was proof offered, but not admitted by the court, that it was afterwards reported that he had died or been killed in France. During the year 1917, the defendant was at work for a road contractor who was engaged in the building of a highway near Hazard. While working there he met Maggie Washburn, who was then Maggie Higgins, and they became sweethearts and were generally so regarded in the community. Even as sweethearts, they had trouble. In the spring of 1918 Alder was at the home of Harvey Eversole in Hazard. The deceased at that time was employed as a domestic in the home of Mannon Cornette, whose wife was a sister and neighbor of Mr. Eversole. At the request of Alder, Eversole went to the home of his sister and asked deceased to come over, telling her that defendant wanted to speak to her. She came, and the meeting seemed very friendly for a time, but presently the defendant accused her of mistreating him, and jumped up and said something which led Eversole to believe he meant to abuse her, whereupon he interfered and told defendant he could not do that in his house; that if he wanted to abuse her, he would have to go outside, so Alder stepped out of the house and made the remark to the deceased that at some time he would get her where he could do as he pleased, and he would beat her up, or words to that effect. In the summer of 1918, John M. Combs was returning to his home one night when he heard a woman crying for help. He ran to her assistance and found a man was dragging a woman down the road. He had her by the hair, and had his right arm around her waist. Combs interfered, and either slapped or jerked the man away. The woman proved to be the deceased. The man jumped back and said, "This is not

your woman.'' Combs testified that he knew Isom Alder, and that while it was dark and he could not see well, that his best judgment was that this was Isom Alder.· The deceased was about 23 years of age. She had apparently been thrifty and industrious, as she had a little house in Hazard which she rented for $12.50 a month. She had bought one or two small Liberty bonds, and had something like $100.00 in money. Isom Alder was then about 20 years old, and in June, 1918, he and the deceased left Hazard together for the purpose of visiting his people, who resided at Emlyn, Kentucky. The deceased took with her on this trip her Liberty bonds and a portion of this money, apparently $50.00 or $60.00. Defendant · claims to have had some money when they left. We next hear of them in Lexington, Kentucky, where they were stopping at the Leland hotel, and while there, they spent all of their money, whereupon the deceased telephoned to Mr. James F. Marcum, who had married a sister of hers, and who was in business in Lexington, and at her request, Mr. Marcum came to the hotel, where he met deceased, and she introduced him to defendant, and at her request he, by endorsement and identification, enabled her to cash a check, which she had drawn on a bank in Hazard. Marcum did not remember the amount of the check. Alder says this was $15.00. After leaving Lexington, deceased and defendant went to Emlyn, the home of defendant's father, Anderson Alder. They stayed there a short time, and on that same day went to Jellico, where defendant claims they were married. That was the 16th or 17th of June, and that same night they returned to the home of defendant's father, and remained there until the night of July 3, 1918. While there, deceased drew a check on a bank in Hazard for $25.00, payable to defendant. It seems to be agreed that this was done on July 3, and defendant says that he and his wife expected to use this money to pay their expenses back to Hazard. Evidently there had been some trouble between the deceased and Isom Alder, or some of his family, for from a letter copied later in this opinion, we see that deceased had written to a friend about sending her a trunk, some blankets, a counterpane, five pairs of shoes and some other things. This did not look as though she expected to leave there soon, but presently we find her· leaving. No member of Isom's family accompanied her to the station. At the station we find Isom ·strolling about the station and deceased sitting on a bench near·

the station, talking with Mrs. Goins, Alder's grand-
mother, who perhaps was endeavoring to patch up the
trouble. Evidently she did not succeed, for deceased
persisted in her determination to go, and did leave on
the train shortly thereafter. What these two women
talked about no one can know now, as both of them are
dead. This trip was over 200 miles, yet the deceased
was so wrought up over something that she started to
make this trip in the night time. Whether she desired
Isom to go along or not, we do not know. Isom had no
money, and we suppose she paid his fare to Corbin. He
and his wife left on the train about 7:30 that evening.
From this record it seems that there is no agent main-
tained at this station, so probably these parties paid
their fares on the train to the conductor, which was not
likely to have been more than a dollar or so. This train
went no farther than Corbin, where it arrived at about
9:00 p. m. The defendant says they went into the depot
to wait the arrival of a train that would take them
to Hazard. This was as far as the Commonwealth was
able to trace Maggie Alder alive. The next day about
four in the afternoon, defendant returned to Emlyn
thoroughly intoxicated. Several parties were at the
depot when defendant got off the train. One of these
was J. T. Potter, and he testifies that when defendant got
off the train he said, "Hello, Mr. Potter," and Potter
replied, "Where is your wife, Isom?" and defendant
said, "She is dead." Potter said, "Don't tell me any-
thing like that." Defendant replied, "Yes, she is dead.
She is dead as hell." Potter asked defendant what the
trouble was and defendant said, "I don't know. She
just got sick and died." Potter asked him where she
was and what they had done with her, and defendant
said, "I left her at Lexington. She died there. Her
people will bury her." This was July 4th. Quite a
crowd was at the station, but only three witnesses were
introduced who testified about what defendant said on
his arrival at the station. One was J. L. Sproul, who
testified to about the same statements that Potter did,
but without going into such detail or elaboration. The
other witness was Lincoln Finley, who merely testified
that he saw Alder when he returned that day, but did not
undertake to detail any conversation between Alder and
anybody else. Judy Potter, wife of J. T. Potter, testi-
fied to having seen Alder and his wife about this town in
the latter part of June and early part of July, and to

having seen them at the depot at the time they are claimed to have left, and that she next saw Isom Alder in her back yard two days after that. She was postmistress at Emlyn and testified that on the early morning of July 5, the time she saw Alder in her back yard, he came up to her back porch and pitched a letter on the porch, and asked her to mail it, and that she picked it up and afterwards mailed it; that this letter was addressed to Mrs. James Marcum, Lexington, Kentucky; that at the time she asked him where his wife was, and he said, "I haven't got any wife. She is dead." Mrs. Potter replied, "You are the biggest liar I ever heard." Alder said, "Yes, you know that she was sick all the time she was here. We went to Lexington to her sister's and she was sick all the way. When we got to Lexington, I called a taxi, and we drove out to her sister's, and she went and laid down, and was dead in 20 minutes." Alder then said to Mr. Potter, "She had some money in the bank. Can I get it? I have her check book." Mrs. Potter identified an envelope that was shown her as the one which she had received from Alder, and which she had postmarked and mailed for him. She further said that she copied the address from that envelope, and that. in a day or two or maybe that day, she was unable to say which, she wrote a letter to Mrs. Marcum. Her husband in his testimony detailed the same conversation.

Mr. James Marcum, who had formerly lived in Lexington, was introduced as a witness and he testified about cashing a check for deceased and identified the envelope postmarked, "Emlyn, Ky., July 5, 1918," and addressed to Mrs. James Marcum, 500 E. 3rd street, Lexington, Ky., and was asked if he had seen, handled and received that letter through the mail. He said that he had. He was asked when was the last time he saw Maggie Washburn, and he said it was at the time he cashed this check for her at the hotel. Mrs. Potter was permitted to read to the jury the following letter taken from the envelope mentioned above:

"Emlyn, Ky., July 5, 1918.

Mrs. James Marcum, Lexington, Ky.

"Please send me $200.00 I will write you a check as soon as I get this send it at once and send in Isom Alder name so I would get it at Emlyn, Ky. From Maggie."

On July 4, some one giving his name as Isom Alder expressed from Pineville, Kentucky, to Isom Alder, Savoy, Kentucky, a suit case. Alder admits that about July 9 or 10 the agent at Savoy, who was dead at the time of this trial, told him a suit case was there, expressed to him and he re-expressed that suit case from Savoy to Lexington. The authorities investigating this case traced that suit case to Lexington and got it from the express office. It contained several letters, some pictures, some ladies' wearing apparel, a small mirror and some toilet articles. Defendant admits this was his wife's property. On August 2, Alder disappeared. He was indicted in February, 1919. The case was continued for process for nearly four years, but shortly before the November term of the Bell circuit court for 1922, defendant surrendered himself and was placed in custody. He was tried on June 2, 1925, with the result noted above. Defendant admitted meeting Maggie Washburn in Perry county in 1917 and that he fell in love with her and that for that reason he married her in 1918. He denied the quarrel with her testified to by Eversole, and denied the assault upon her testified to by Combs. He said that after their marriage he remained at his father's with her until July 3, when he left with her for the purpose of returning to his work at Hazard. He said the train on which they left only went as far as Corbin. While they were sitting in the depot at Corbin waiting for their train, a strange man came up to where he and his wife were sitting and sat down by her side; that this was a low, heavy set, dark complexioned man, about 25 years of age; that after talking with his wife for a while, this man walked out of the depot, whereupon Alder asked her who this man was and she replied that he was her other husband, and while he and his wife were sitting there talking about this man, the stranger returned, and after a short conversation with his wife she picked up her suit case, told Alder she would be back in a minute and stepped out of the depot with this man, and that was the last time he had ever seen her. Bradley Mayfield testified that he saw Alder and some woman with him in the depot at Corbin on the evening of July 3; that just before the train passed Corbin about four o'clock in the morning of July 4, Mayfield again saw Alder in the depot, but this time he was alone. Mayfield got on this train about four o'clock on his way to Harlan. Mayfield says this woman he had seen with

Alder the evening before also got on the train and that he saw her on the train and that there was a man with her who appeared to be about 25 years of age; that he was a black haired man and had on a blue suit of clothes and that he saw her and this man get off the train at Pineville and start down the north side of the depot. Alder said he remained in Corbin until the next afternoon, when he returned to Emlyn, arriving there about four o'clock. He denied the conversation with Potter at the depot, denied having a conversation with Potter and his wife the next morning, and denied mailing any letter to Mrs. Marcum. He said that he never was in Bell county in his life until he came there to give himself up. He denied having been there with his wife and denied killing her. He said he ran away because his brother advised him that he was charged with the murder of his wife and that he had better go away and stay awhile until his brother could investigate the matter. He said that he could not read or write and that he did not ship any suit case from Pineville to himself at Savoy and that he did not write any letter to Mrs. Marcum and had no one write a letter for him. The agent of the express company that received and sent this suit case from Pineville on July 4, was introduced as a witness. She was shown a photograph of the receipt issued for this suit case and in her evidence we find this:

"Who was D. Z. Eads? Myself.

"Who signed that receipt? I signed it.

"What is that receipt for, if you can tell from the letters? For one suit case.

"On that occasion did any person express through the office of the express company in Pineville a suit case on the 4th of July, 1918? A man.

"A man did that? What did he do, if anything, on that express receipt? He signed his name.

"Did you sign it for him or did he sign it in person? He signed it himself.

"Had you ever seen that man before? Not that I know of.

"Have you seen him since? Not that I know of.

"No cross-examination."

It seems strange to us that this witness' evidence was left in this form. Alder, of course, was present in the courtroom, and we can not understand why this witness was not asked to look at Alder and see if he was the

shipper of the suit case; but as this witness was summoned and brought to court by Alder, the presumption must be that he knew what she would say and was, for some reason, afraid to ask her.

The witness who discovered the dead body of this woman said that when he saw her knee sticking up he looked up the bank of the river and saw a fellow sitting under a plum tree and he said, "I have found a dead man here." While the witness was climbing over the fence this man left. He described the man as a low, heavy set fellow, about 35 years old, weighing about 175 pounds, dressed in a dark Palm Beach suit. He said that he was sitting in full view of the body of this dead woman and about 30 or 35 feet from it. He was asked to look at Alder and say if he was the man he saw, and he said he was not. The remainder of the evidence introduced on behalf of defendant was devoted to showing that he was illiterate and to trying to impeach the witnesses for the Commonwealth.

This case was tried seven years after the crime was committed, and as a result, many witnesses had either died or moved away, and the memories of those who testified in this case had become dimmed and confused by the lapse of time. As a result there was, as was to be expected, considerable conflict in the evidence. A large part of the defendant's brief is devoted to the court's ruling in admitting and rejecting evidence. Mrs. Mannon Cornette testified that in July, 1918, she saw an advertised description of this woman that had been found dead, and of the clothes, and that her husband wrote to the authorities at Pineville and a police officer, Arthur Allman, came to see her and brought with him a suit case containing some shoes, some clothing and other things, which she recognized as belonging to Maggie Washburn. She testified that Maggie Washburn had been living with her for about a year previous to her death. She had a lock of the hair of Maggie Washburn which she compared with a lock of hair picked up where this body was found. Her husband said he was not so well acquainted with the handwriting of Maggie Washburn, but thought he knew it well enough to testify about it, and would know a letter written by her if he would see it. He was shown a letter addressed to Mrs. Clara Cornette, box 302, Hazard, Ky. He said it was the handwriting of

Maggie Washburn or Maggie Higgins. This letter was then read to the jury:

"Emlyn, Ky.

"Mrs. C. E. Cornette, Hazard, Ky., box 302.

"Dear Mrs. Cornette:—I thought I would write a line this A. M. I want you to go over to granys house and pack my new trunk and send it to me. Put my blankets and counterpin and my shoes I have got about 5 pairs and put all them things that is in that old suit case and my pockets to my new dress gingham. Ill send you stamps and you write me a line and tell me if you will send them. I want both of my trunks and I will send you money to have them sent to the express so write me a letter as soon as you get this and let me hear from you at once. Maggie."

Alder is complaining of the introduction of this letter, but as he failed to object when it was offered, that complaint is unavailing. Mr. Marcum was asked about the letter postmarked Emlyn, Ky., July 5, 1918, which had been read to the jury as a part of the evidence of Mrs. J. T. Potter. He was asked whether or not it was in the handwriting of Maggie Washburn or Maggie Alder. He testified that he did not think it was her writing. He said he was acquainted with her writing and had seen her write. This evidence was properly admitted. Mrs. Potter read to the jury the letter postmarked Emlyn, Ky., July 5, 1918. Mrs. Potter had testified that was the letter which defendant had given her to mail. Mr. Marcum testified that was the letter that he had received, and it appears to have been sufficiently identified. Mrs. Potter was asked if she knew the handwriting upon that letter and she said she did not. It does not make any difference who wrote it, if Alder brought it there and asked her to mail it, *prima facie*, he is charged with knowledge of it.

Mrs. Lucy Smith, a sister of deceased, testified that she was acquainted with her sister's handwriting and had seen her write. She was then shown the letter addressed to Mrs. Clara E. Cornette and was asked who wrote that letter and addressed that envelope. The witness stated that that was the handwriting of deceased. That letter was then passed to the jury for examination. Defendant insists that the introduction of these letters

was improper because the Commonwealth had failed to establish the genuineness of these letters as required by section 1649, Ky. Stats., but his position is not well taken, because the section of the statutes referred to is only applicable in cases where an effort is being made to prove the genuineness of the handwriting of a person by comparison with other handwritings of such person. It has no application here. At the time this body was found, Mr. E. F. Baker was city attorney of the city of Pineville, and he very properly and very promptly made a diligent effort to ascertain facts relative to the identity of deceased, and as to how she came to her death. After his term of office as city attorney had expired, he was employed as one of the counsel for defendant. The Commonwealth called him as a witness and proved a large part of its case by him. Defendant objected to that, but a sufficient answer to his objection is to say that if his position were correct, and that the mere fact that he had employed this witness as his counsel was sufficient to keep the Commonwealth from introducing him, that he could thereby destroy the Commonwealth's case, which will not be permitted. Of course, the Commonwealth could not ask this witness to testify about anything he had learned about this case from Isom Alder after he had been employed, and it did not do so. He testified that in the course of his investigations he went to Pineville and at that place he saw a record of the shipment of a suit case made on July 4, 1918, shipped from Pineville in the name of Isom Alder and shipped to Isom Alder, Savoy, Ky. Defendant cites the case of Powell v. Com., 149 Ky. 415, 149 S. W. 889, and insists that this is reversible error. It is true the court did reverse the Powell case because of similar evidence relative to a shipment by express, and in the concluding part of that opinion the court said: "There being no other testimony to show the guilt of the accused, the judgment is reversed." If, in this case, there were no other testimony tending to show the guilt of the accused, a similar result might be expected. Defendant himself took the stand and during the course of his examination, admitted that this suit case was shipped to him at Savoy, Ky., and that he reshipped it to Lexington to himself. He says that the first he knew of the suit case being at Savoy was when Fred Byrd, the agent, told him there was a suit case there for him. He says he recognized it as his wife's suit case.

The Commonwealth put in evidence, over defendant's objection, a photograph of one man and two women. On the back of this photograph was written, "Mrs. J. D McAnnis and her cook and hubby." It is admitted that the larger woman in this photograph is the deceased. In the recent case of Cox v. Com., 215 Ky. 585, 284 S. W. —, we said:

> "The photograph merely gives to the jury an idea of the appearance of the man when in a normal state, and the Commonwealth might have proven that by some of the witnesses, hence we can not see how he was prejudiced by the photograph, though we admit its introduction was error."

Defendant complains because the witness Bob Shell was not permitted to state the apparent age of the man he saw under the plum tree at the time he found this body, nor was he permitted to say how the fellow acted when he told him he had found it. There is in the record an avowal that if the witness were permitted to answer, he would state: "He looked white in the face to me. I just got over the fence and by that time I noticed he was 60 yards from me and I ran to the depot and he got away before I got there." We are unable to see how this evidence was competent and regard its rejection as proper. Just after this body was found, Mr. Baker, in the course of his investigations, made a written memorandum of what various parties knew about the matter and this memorandum was in the hands of the Commonwealth. When the witnesses J. L. Sproul and Lincoln Finley were introduced and asked about what Isom Alder said when he got off the train on the evening of July 4, about his wife's death, they did not testify as fully and as completely as this memorandum indicated they should. Afterwards the Commonwealth recalled Mr. Baker and asked him what these parties had told him just after the body was found and he, refreshing his memory from this memorandum, testified to what they had then stated about what Isom Alder said on that occasion, thereupon the court said this:

> "Gentlemen of the jury, it becomes my duty to admonish you now that the evidence of Mr. Baker in regard to statements made by Mr. Finley to the effect that the defendant and his wife left for Corbin on the train and about the statement that he made

about his wife,.dying in Lexington is not substantive testimony as to whether or not he left for Corbin or as to whether or not his wife died in Lexington, or whether or not he said that, but goes to you for the purpose of contradicting Lincoln Finley, if in your judgment it does impeach or contradict him, and for no other purpose, and the same admonition applies to the testimony of J. N. Sproul, as to statements he made and as to Baker's testimony as to statements made by Sproul. This does not remove from you the statements that each of those witnesses made themselves, but applies to Mr. Baker's testimony as a contradiction of what they said, or didn't remember.''

Defendant objected to the court's admonition, whereupon the court said: ''I was making that for the benefit of the defendant; if you object, I will withdraw the admonition.'' Defendant says that by this remark of the court his counsel were humiliated in the presence of the jury, and he alleges this was very prejudicial, but we can not agree with him.

While J. T. Potter was on the stand a writing was handed him and he was asked by the defense whose handwriting it was, and he said, ''That is mine.'' The defense then handed him some writing and asked him whose handwriting it was. He said, ''That is my wife's hand.'' The defense then asked that these be filed in the case. The Commonwealth objected and the court sustained the objection. This the defendant now says was very prejudicial to him. He says that Mrs. Potter had testified that she wrote a letter to Mrs. Marcum in Lexington and that Mr. Marcum in his evidence states he only received one letter from Emlyn in 1918, and the defendant argues that therefore it follows that the letter introduced and copied above, dated at Emlyn, Ky., July 5, 1918, was in fact written by either Mr. or Mrs. Potter and that he should have been permitted to introduce these specimens of their handwriting in order that the jury might by comparison determine whether or not the letter of July 5, 1918, asking for $200.00 had been written by one of the Potters. Here is a case where section 1649 of the statutes does apply, and its application is fatal to the defendant's' contention. It is true, Mr. Marcum admits he only got one letter, but he does not undertake to say that his wife did not get another letter. Mrs.

Marcum is dead, hence we can not have the benefit of her testimony in the matter. Mrs. Potter did not say that she wrote and mailed her letter the same day that she mailed the letter delivered her by Alder, and it may be that the two letters arrived in Lexington at different times. The deceased was an entire stranger to the Potters and there is not the remotest probability that they would have known that she had a sister living in Lexington, or if they knew that, that they would have known her street address.

Defendant sought to introduce evidence to show that the reputation of Maggie Washburn for general moral character, virtue and chastity was bad. This the court very properly. refused to admit, for if it was bad, that gave defendant no right to kill her.

His next complaint is that Johnny Combs was permitted to testify as stated above about an assault made on the deceased by the defendant, because Combs said that his best judgment was that this was Isom Alder. The witness said it was dark and he could not see; but we take it that from what he could see, that what he said was true.

Defendant had taken some depositions, and he read the depositions of two witnesses. At the conclusion of the second deposition, the court said: ''The jury will take the statements of this deposition of this witness as if she had been here testifying in person.'' Defendant has seized upon that and says that this statement of the court made at the conclusion of this deposition is equivalent to saying to the jury that they should disregard the deposition of the first witness. The jury is supposed to know the purpose for which it was read, and we can see no necessity for any admonition at all. We admit that it would have been better if the court had made his remarks apply to both depositions, but we can see no prejudicial error in the remark made.

Defendant testified that he saw Mrs. Young in Corbin about nine o'clock on the morning of July 4. His purpose in showing this was to show that he had not been to Pineville because, as he says, it would have been impossible for him to have gone to Pineville and got back to Corbin by nine o'clock. It is true, there were no passenger trains on which he could have returned, but the track between Corbin and Pineville is a very important part of the L. & N. R. R. and so important, in fact, that it is double tracked. While passenger trains may not have

been available to him, there is nothing to show that he could not have ridden a freight train. He asked Mrs. Young three questions about this meeting, all of which questions were leading, all of which questions could be, and were answered, ''Yes.'' The Commonwealth objected, and the court properly sustained the objection, as they were leading.

At the time this case was tried, Mr. and Mrs. Potter lived in Knoxville, Tenn., and Mr. Potter refused to attend the trial unless someone paid him the same for his time attending the trial that he would get for working in Knoxville, that is, $6.00 per day, and the court admitted evidence to show some one paid him that. Thereupon defendant sought to prove that the state had allowed and paid to Mr. and Mrs. Potter their traveling expenses and the usual witness fee, but was properly not permitted to do so.

His next complaint is of the instructions. Defendant says that the court erred in giving the manslaughter and self-defense instructions; but we have often written that where the evidence of the killing was entirely circumstantial, it is the duty of the court to do so.

His next complaint is that the verdict is flagrantly against the evidence, and was the result of passion and prejudice. We have said: ''A judgment of conviction will not be reversed on the ground that the evidence is insufficient to support it, unless the verdict is palpably against the evidence.'' This is so, although the evidence be purely circumstantial. Hall v. Com., 152 Ky. 812, 154 S. W. 397. He says the court erred in its instructions to the jury in using the expression, ''With a blunt instrument,'' as there was no proof of the use of an instrument. There was proof showing the nature of the wound inflicted, and from that the jury may draw its own conclusion as to the means by which it was inflicted.

''The exact manner of the killing need not be proved. It is sufficient to show the finding of a dead body and the appearance thereof showing acts of violence.'' 30 C. J. 287.

''A mere possibility that death resulted from some cause other than the act of the accused, will not overcome facts proved leaving no rational grounds for doubt.'' Id.

His next complaint is that he should have had a peremptory instruction, but we can not agree with him.

His next complaint is of misconduct of the officers in charge of the jury. Here is what happened: On Tuesday, June 2, Deputy Sheriff Sam Van Bever was placed in charge of the jury, sworn and admonished. On the morning of Wednesday, June 3, owing to sickness in his family, Mr. Van Bever desired to be relieved. Thereupon J. H. Wilson was appointed as special elisor, was sworn, admonished by the court, and placed in charge of the jury. On Thursday morning, the 4th, the jury was brought in by Mr. Wilson. At noon, Thursday, the jury was placed in charge of Mr. Van Bever, but having been unable to reach a verdict that day, were placed in charge of Mr. Wilson, special elisor, for the night, and he kept them during the night and until nearly seven o'clock next morning, when on account of having to keep a business appointment, he called Mr. Van Bever and turned the jury over to him, and the orders of the court show that Mr. Van Bever had charge of the jury when court opened. It will be noted that each of these officers had been sworn, and this court has said: "After being once sworn as required, it is not necessary to administer the oath again at each adjournment or recess of the court." Com. v. Shields, 2 Bush 81. It would be a better practice for the courts in the trial of capital cases at the beginning of the trial to call the sheriff and all his deputies and to swear them and admonish them as to their duties in regard to keeping the jury together, and that whichever one had charge of the jury should observe these admonitions. Both of these officers had been sworn; both had been admonished, and we can find nothing to indicate that this jury was not properly kept together.

His next ground for new trial is misconduct of the jury. It seems that one member of this jury talked to some person, but this conversation occurred in the presence and hearing of the sheriff who had them in charge, and related in no way to the case under trial.

His next ground for a new trial is the misconduct of the Commonwealth's attorney in the closing argument of the case. The bill of exceptions shows that the Commonwealth's attorney said: "This case is as bad as the assassination of Presidents Garfield, Lincoln and McKinley, and this defendant on trial is no better than those defendants." The defendant objected to this argument, but the court overruled his objection, whereupon he excepted. We can see nothing improper in that argument.

His next ground is that the court erred in vacating the bench and leaving the courtroom where this case was being tried during the argumentof the case, but that is only what he says. We have no proof that that occurred, and there is nothing in the bill of exceptions relative to that. These alleged errors relative to the misconduct of the judge, jury, and Commonwealth's attorney should be embodied in the bill of exceptions, and unless they are so embodied, we can not consider them. We have often announced this rule, and in the case of Hopkins v. Com., 210 Ky. 378, 275 S. W. 881, we gave our reasons for adopting this rule.

Defendant contends that the Commonwealth failed to show this woman was killed in Bell county. While it is admitted a dead body was found in Bell county, it is insisted that there is no evidence that the fatal blow was there delivered. We admit that must be established by the evidence, but as the venue does not affect the issue of the defendant's guilt or innocence, being solely a question of the court's jurisdiction, the quantum of proof required is not extensive.

"Slight evidence will be sufficient to sustain the venue and slight circumstances from which the jury might infer the place where the crime was committed are held to be sufficient." Sebree v. Com., 200 Ky. 534, 255 S. W. 142; Stubblefield v. Com., 197 Ky. 218, 246 S. W. 444; Keefe v. Com., 175 Ky. 51, 193 S. W. 645.

This body was found in a wash on the river bank. No effort had been made to bury or otherwise conceal the body, and the jury was fully authorized to believe the woman had been killed within a few feet of where the body was found.

Defendant contends that there is nothing to sustain his conviction; that the evidence of J. T. Potter should not have been considered, and that when that is eliminated, he should be acquitted. He attacked the reputation of Mr. Potter. We did not see these witnesses, but the jury did, and the jury had a right to draw their own conclusions about whether or not they should believe Potter in spite or what these people said about him. Besides, no effort was made to impeach Mrs. Potter or to impeach the witnesses Sproul and Finley, and they testified to practically the same thing Potter did.

Defendant's account of some man coming into the depot at Corbin and taking his wife away from him; that he sat down in the corner and went to sleep and saw her no more, is incredibile. A bridegroom of a fortnight, jealous as this record shows defendant to be, would not have done that.

Defendant insists that when he proved by Mayfield that this woman went to Pineville with some stranger, he produced such evidence that he should go acquitted; but, as we have indicated above, this woman was probably leaving Alder's home under some great displeasure, else she would not have started away upon a 200-mile trip in the night time. Women ordinarily do not do so. The jury may have thought and there was evidence to justify it, that she was afraid of Isom Alder; they may have reached the conclusion that she was trying to get away from him. We know he had threatened to do her violence. We know her departure from Emlyn was sudden and unexpected, and the jury may have reached the conclusion that at the first opportunity, which presented itself at Corbin when she met a friend, she explained to him the situation and asked him to protect her. They may have believed that she and that friend left Corbin together on the train for Pineville, and that defendant followed her on the same train. The jury may have believed that she and this stranger got off the train and started down the north of the depot as Mayfield says, and defendant followed them and killed deceased by striking her with some sort of weapon; that the stranger only saved himself from a like fate by flight; that thereupon defendant robbed his victim of her suit case and her money and bank book, tossed her body to one side, came back to Pineville, expressed the suit case to Savoy and caught a freight train. We can well understand how this stranger would not be disposed to come forward and tell what he knew either then or now, for he was in a peculiar situation. He had traveled from Corbin to Pineville with another man's wife. He had perhaps seen her killed in his presence. He might think that it would be so impossible for him to make an explanation of these things that it is best for him to say nothing. This may have been the man that was sitting under the plum tree, looking at the body at the time it was found. All this may be true. The jury was, under the evidence, warranted in finding defendant guilty. He knew too much about his wife's being dead in advance of other people. He had her property;

her suit case, her bank book, probably her money. He says he is an ignorant man, and most ignorant men are jealous hearted. All jealous hearted men are ignorant, else they would not be jealous hearted. We know defendant was jealous hearted from his remark to Combs; we know he was cruel and vindictive from what Combs tells of the assault he witnessed, and what Eversole tells of the assault he prevented, and we know that he then made threats of what he would do when opportunity presented. We know that some one shipped a suit case out of Pineville to Isom Alder. The party who shipped that suit case gave his name as Isom Alder. The agent that made the shipment testified. Her testimony is given above. We know from this evidence, the attorneys for defendant had seen and talked with this woman before she was introduced and the presumption is they obtained from her, when on the stand, everything she could say beneficial to defendant.

The proposed evidence of the newly discovered witness, Gilbert, does not impress us, for in his examination is was disclosed that seven years before this trial, he had told the defendant's attorney, Baker, of things he knew; he told him then of having seen this woman in Baxter, as he thought; and of the man he saw with her. It does not seem to us that reasonable diligence was exercised to obtain his evidence in time for this trial, nor does it seem to us that the newly discovered facts are of such a nature that if they had been proven before the jury, they would have in any wise affected the result.

We have considered this care carefully and can find no error prejudicial to the rights of the defendant.

The judgment is affirmed.