John Oscar APPLE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Dec. 14, 1956.

E. R. Gregory, Bowling Green, for appellant.

Jo M. Ferguson, Atty. Gen., Zeb A. Stewart, Asst. Atty. Gen., Duncan & Huddleston, Bowling Green, for appellee.

HOGG, Judge.

John Oscar Apple seeks a reversal of the judgment sentencing him to life imprisonment in the penitentiary for the murder of John L. Meredith. He urges that (1) the lower court should have directed a verdict of not guilty, and (2) the court permitted incompetent evidence to be heard by the jury.

The conviction of Apple was based entirely upon circumstantial evidence. He did not testify at his trial. The determination of ground (1) calls for a statement of the essential facts adduced at the trial.

Around 5 a. m. on August 1, 1955, Meredith, who was 72 years of age, was killed in the liquor store of his son-in-law, G. E.

Phelps, near Bowling Green. For some-time prior to his slaying he had been sleeping in the store at night and serving as a clerk in the store during business hours. He was killed by a person, or persons, who broke into the store and during the course of committing a robbery thereof. Decedent was hit over the head with a bottle of whisky, an electric cord was tied around his neck and throat, and he was otherwise gagged and bound. Death could have resulted from the blow on his head, or from strangulation.

The body was discovered about 8 a. m. on the fatal day. Investigation by the police authorities caused Apple to be suspected of having committed the crime. In the afternoon of that day, Apple voluntarily went to the police officers and signed a statement that he, Lizzie Mae Cox, and others, were near the railroad depot in Bowling Green in his 1951 Buick automobile about 11:15 p. m. on the night of July 31 when a group of people who claimed to have missed the train for Louisville asked him to take them to Louisville in his automobile for the price of $30. He told them he was too tired at the time but that he would take them the following morning about 5:30 or 6 a. m. He went home with Lizzie. Mae and spent the night with her and slept in the same bed with her; arose from bed about 5 a. m., leaving Lizzie Mae in bed; picked up his passengers at the train station and took them to Louisville, reaching Louisville about 1:15 p. m. on August 1.

While Apple was with the officers making his voluntary statement, the officers observed what appeared to be blood spots on his T-shirt. Four one-dollar bills were taken from his person upon his arrest. On the corner of one of the bills was a considerable blood spot. When asked about the blood spots, he stated that the blood got on his shirt as a result of his girl friend picking bumps on his person, and the spot was on the dollar bill when he received it in change at a filling station.

While the murder and robbery were being committed, approximately $35, including four one-dollar bills, was taken from the cash drawers in the liquor store. Apple, who had previously borrowed $30 from his employer, repaid him that amount on the day of the robbery.

Three motorists, in separate vehicles, while passing the liquor store about 5 o'clock on the morning of the killing, saw a 1951, 1952, or 1953 two-toned Buick automobile parked nearby and a Negro at or near the liquor store. One of the witnesses did not think Apple was the man he saw; another did not distinguish the features of the colored man he saw at the window of the store, as he paid no particular attention to him and did not identify appellant as being the man he saw; the third motorist would say only that the man he saw was "built" like Apple, and that he was wearing what appeared to be a white straw hat similar to the one Apple owned. One of these witnesses testified that as he drove by the liquor store the Negro he saw was in the act of putting on a pair of gloves.

Within two days after the crime had been committed, these early-morning motorists went to a parking lot in Bowling Green and picked out appellant's automobile as the one they had seen at the liquor store as they passed about 5 a. m. on the morning of the killing. One of them was a little less positive than the other two. However, he did testify that appellant's automobile was the same type car he saw at the liquor store.

A merchant policeman, Tennessee Lyle, testified that at about 3 a. m. the morning of the killing he saw appellant's car, then occupied by two or three men, leave the place of one Nichols in Bowling Green. He followed the car through the city but lost sight of it when the driver of the car, traveling out the road toward the Phelps Liquor Store, outdistanced him. He positively identified this fleeing car as the car which belonged to appellant.

Appellant's consort, Lizzie Mae Cox, testified that she did not sleep with appel-

lant the night before the killing; on the contrary, about midnight of July 31 appellant left her place in his Buick car and she did not see him again until the afternoon of the day of the killing.

After his arrest, Apple was confined in the Warren County jail. Bobby Caulfield, a trusty in the jail, testified that Apple gave him six letters to mail. They were addressed to various persons in Bowling Green, including G. E. Phelps, Harry Ashby, a police officer who participated in the investigation of the crime and in questioning Apple when he made his written statement, and the Chief of Police of Bowling Green. These letters were signed either "Kill Roy" and "J. B.," or "K. R." and "J. B." They constituted confessions of the killing, with minute details of how the crime had been committed, along with a plea to turn the "poor innocent Negro free." Without setting out in this opinion the substance of these letters, all of which letters indicate the writer was a depraved and vicious personality, it seems sufficient to say that things were revealed in the letters which only a person who was there could know about. For instance, in the letter to Phelps it was stated: "We are sorrow kill your father law but he try to get a pistol from under his pillow." In another letter it was said: "Yes we kill the old goat, because he try to get pistol out under pillow." The proof shows decedent did keep a pistol under the head of his bed. The letters described in some detail where and with what he was hit in the head, and how and with what he was tied. Again, for instance, one of the letters told about taking nine cases of liquor during the robbery. Nine cases of whisky were in fact taken during the robbery.

Considering the contents of the letters in the light of the facts developed at the trial, we are led to the inevitable conclusion that they were intended by the writer to convince the recipients that the sender knew all about the crime, and that the Negro was innocent.

Not only did Caulfield testify about receiving these letters from the hands of Apple, but two other inmates of the jail testified that they furnished Apple with tablet paper and envelopes. Upon examining the "Kill Roy" letters, they testified that the envelopes were of the kind they had given him and the tablet paper was of the same kind, except two of the letters were written on wrapping paper which they had not furnished him.

A letter to Mary Elizabeth McClellan, signed by John Apple, was intercepted when Apple tried to surreptitiously get it out of the jail to her. In it the writer asked the McClellan woman to claim that Apple had spent the night of the killing with her and remained with her until 5 o'clock a. m. In her testimony the McClellan woman stated that she well knew the handwriting of Apple, and was positive the letter was in his handwriting. She also stated she did not spend the night in question with Apple. Another letter was received by Taylor, who had occupied a cell in the same block with Apple for sometime. The letter, signed by John Apple, asked Taylor to say he wrote the "Kill Roy" letters.

We shall now take up the alleged admission of incompetent evidence.

(a) Leading questions.

■■■ One of the motorists who observed the automobile near the liquor store near 5 a. m. on August 1, was asked, "Are you sure the car which you pointed out there (at parking lot) is the same car which you saw out there on August 1st." He answered in the affirmative. We fail to see that the question was leading since the witness had already testified to the same effect. Also, we find no merit in the contention that evidence concerning the kind of hat being worn by a Negro at the liquor store was elicited through leading questions, nor do we find any merit to the claim of other alleged leading questions. Even if the questions complained of as being lead-

ing could be considered of that class, the defendant was not prejudiced. Permitting leading questions is generally within the trial court's discretion, and it is not reversible error unless the court abused his discretion, and a miscarriage of justice resulted. That is not this case. Meredith v. Commonwealth, 265 Ky. 380, 96 S.W.2d 1049.

(b) Admissibility of the letters.

Appellant strongly contends that the letters were inadmissible for any purpose. It should be noted here that the court in its written instructions to the jury charged the jury they should not consider the letters unless they believed Apple wrote and sent them, or directed them written and sent.

■ Undoubtedly the "Kill Roy" letters incriminated some one and it is a reasonable inference it was the appellant himself. But appellant argues that he had no opportunity to examine the letters before trial and neither was the authenticity of the letters established before introduction into evidence. He relies upon KRS 422.120. But that statute applies only to cases in which an effort is made to prove the genuineness of the handwriting of a person by comparison with other handwriting of such person. Alder v. Commonwealth, 215 Ky. 613, 286 S.W. 696.

■ Each of the recipients testified the "Kill Roy" letters introduced in evidence were the same as received through the mail. In view of their identification by Caulfield it seems clear they were admissible. Regardless of whether Apple had written them, the Commonwealth proved he had them in his possession for delivery, and that he did deliver them to another. They constituted evidence for the jury.

■ The McClellan letter was clearly admissible because, before it was received, she testified she was acquainted with

Apple's handwriting, and that the letter was in the handwriting of Apple. See Alder v. Commonwealth, supra, 215 Ky. 613, 286 S.W. 696.

The letter signed by John Apple and received by Taylor was read to the jury without objection.

(c) The blood stains.

The evidence about the blood spots was given by the two police officers who were present when Apple made his statement. Appellant argues that their evidence identifying the stains as blood stains was incompetent, and that the article showing the alleged stains should have been produced as the best evidence.

■ One of the officers, Sergeant Calvert, testified that he had been trained in the recognition of blood. We hold that the evidence of both officers concerning the blood spots was competent. Edmonds v. Commonwealth, 230 Ky. 725, 20 S.W.2d 745; 20 Am.Jur. 746, Evidence, section 887.

■ With respect to the contention that the articles allegedly containing the spots should have been produced, it seems sufficient to say that the original articles were not available, the evidence indicated.

■ Coming now to ground (1) which relates to the requested directed verdict, we are of the opinion that the court properly overruled the motion for a directed verdict. In the case at hand we have proven in the record a variety of circumstances, the occurrence of which, or any great portion of them, point unerringly to appellant's guilt. The evidence being of a probative character, even though circumstantial, tended to establish guilt. It was a case for the jury. Hartman v. Commonwealth, Ky., 282 S.W.2d 48.

Judgment affirmed.