## Joe Pearl Fuson, Walter Fuson, and Marna Fuson v. Commonwealth.

(Decided June 19, 1923.)

### Appeal from Whitley Circuit Court.

1. Criminal Law—Policy of Law is to Afford Speedy Trials.—Since justice must be swift to be effective and delays lessen both the chance and effect of convictions, it is the policy of the law to afford speedy trials.

2. Criminal Law—Speedy Trials Will Not be Enforced to Prejudice of Defendant.—It is even of greater importance for justice to be certain and sure than to be speedy, and in seeking speedy trials

courts are careful to avoid being rushed into hasty conclusions by popular clamor, or public sentiment, but seek to give each side a fair hearing, and a conviction will be reversed, where defendant was not given sufficient time properly to prepare and present his defense.

3. Criminal Law—Defendant, for Whom Counsel is Appointed, is Especially Entitled to Time to Prepare for Trial.—The rule that a defendant is entitled to sufficient time to enable him and his counsel properly to prepare and present his defense is especially applicable, where the defendant is unable to employ counsel, and the court appoints to defend him counsel who are engaged in other matters at the time, since such counsel must accept the duty and cannot refuse, as in the case of employment.

4. Criminal Law—Denial of Continuance Not Appearing on Record Cannot be Reviewed.—Where the judgment of the court on a motion for continuance of criminal prosecution does not appear in the record and no exceptions were taken thereto by defendants, it cannot be reviewed on appeal from the conviction, under Criminal Code of Practice, sections 280-282.

5. Criminal Law—Facts Held Not to Show Prejudice to Substantial Rights of Accused by Denial of Continuance.—Where the affidavits of defendants for a continuance because their counsel did not have time to prepare for trial were not supported by affidavits of the counsel, and it was not shown that they were prejudiced by the trial, or would have been benefited by an extension of time, the court cannot hold that their substantial rights were prejudiced by the denial of the continuance.

6. Homicide—Omission of Requirement to Find Death Within Year and Day Not Error.—In an instruction defining murder, in requiring the jury to believe that defendants shot, wounded, and killed deceased, the omission of a requirement that they find deceased died in year and day thereafter was immaterial where the evidence on behalf of all parties showed that he died on the spot and there could be no issue as to the time of his death.

7. Homicide—Instruction Held Not Erroneous as Requiring Same Punishment to be Inflicted on Each of Two Defendants.—An instruction that, if the jury had a reasonable doubt as to whether two defendants had been proven guilty of murder or manslaughter, they should give them, or either of them, the benefit of the doubt, and find them or him guilty of the lower offense, and fix their punishment as set out, was not erroneous, as requiring the jury to fix the same punishment for both defendants, though it would have been made clearer by inserting the words "or his'" after the word "their" in that clause, since the other parts of the instruction showed each was separately given the benefit of the reasonable doubt.

8. Homicide—Instruction on Aiding and Abetting Need Not Allege Shooting was Induced Thereby.—In a prosecution of several defendants for homicide, an instruction on the question of aiding and abetting was not erroneous, because it did not include therein

the phrase "that said shooting and killing was induced thereby," since one who is either actually or constructively present, aiding the commission of an offense, becomes a principal in the second degree, and his guilt is determined by his motives, and not by the degree of his influence over the one who actually committed the offense.

9.    Homicide—Evidence Held to Sustain Conviction of Three Defendants for Murder.—Evidence that the three defendants, who were brothers, overtook deceased on his way home from church, at which time the homicide occurred, that there had been previous trouble between them, and threats made by defendants against deceased, and conferences between defendants between the time of the previous trouble and the shooting held sufficient to warrant a finding that the three defendants conspired to kill decedent, notwithstanding their testimony that the shooting resulted from a sudden and unexpected affray started by an attack of decedent on one of them.

W. B. EARLY and B. B. SNYDER for appellants.

· CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

The defendants, Tom Fuson, Joe Fuson, Walter Fuson and Marna Fuson, were jointly indicted in the Whitley circuit court charged with the murder of John Mays, the indictment including charges of conspiracy and of aiding and abetting. In a joint trial all were found guilty and the punishment of Joe and Walter was fixed at confinement in the penitentiary for life, and that of Tom and Marna at such confinement for the periods of twenty-one and ten years, respectively.

The lower court granted a new trial to Tom and the others have appealed. Grounds of complaint are (a) the court erred in overruling defendants' motion for continuance, (b) in its instructions, (c) the verdicts are flagrantly against the evidence. Most emphasis is laid on the first ground.

The defendants were arrested on the morning of September 3, 1922, and incarcerated in the Whitley county jail. They were indicted on the 21st day of September, and their trial set for the sixth day of October, being the 17th day of that term of court. On the second day of October the court appointed three able attorneys to defend them. When the case was called for trial they filed

a motion for a continuance, and in support of it their own affidavit, in which, after referring to the absence of material witnesses and their testimony, they said: "They state that they have been in jail and unable to employ counsel, and the court appointed counsel who have been busy in other cases and have had no chance, except a few minutes when they were arraigned for trial, to confer with their attorneys."

It is the duty of the courts to carefully weigh the correlative rights of the Commonwealth and of the defense in criminal cases. To be effective, justice must be swift. It is a matter of common knowledge that delays in such cases lessen both the chance and the effect of convictions, and it is the policy of the law to afford speedy trials. But it is of even greater importance for justice to be certain and sure, and in seeking speedy trials courts are careful to avoid being rushed into hasty conclusions by popular clamour, or by force of public sentiment, but seek to give to each side a fair hearing. With that object in view this court has not hesitated to reverse cases where it appeared that sufficient time and opportunity were not given the defendant and his counsel to properly prepare and present his defense. This may apply to any criminal case, but is especially applicable where the defendant is unable to employ counsel, and the court appoints to defend him counsel who are engaged in other matters at the time. An attorney who has contracted sufficient business to keep him engaged during the term might refuse to accept employment in a criminal case which has suddenly arisen, but as an officer of the court he must perforce obey its mandates, and when so appointed may only accept the duty and do the best he can. As illustrating the rule reference might be had to the cases of Allen v. Comlth., 168 Ky. 325; Smith v. Comlth., 133 Ky. 532; Samuels v. Comlth., 154 Ky. 758; Stroud v. Comlth., 160 Ky. 503; Helton v. Comlth., 27 L. R. 1163; Miller v. Comlth., 197 Ky. 703. However, in this case the judgment of the court on the motion for a continuance does not appear in the record and no exceptions were taken thereto by defendants and consequently it cannot now be considered. Criminal Code, secs. 280-2; Bates v. Comlth., 13 Rep. 132; Blanton v. Comlth., 147 Ky. 814; O'Brien v. Comlth., 89 Ky. 364; Green v. Comlth., 26 Rep. 1227; Smith v. Comlth., 26 Rep. 1229.

Besides, none of the distinguished counsel for appellants has filed an affidavit in support of his client's state-

ments, and the latter are not in a position to state the extent of their attorneys' preparation, and it is not shown that they were prejudiced by haste or would have been benefited by an extension of time, and we are therefore unable to say that their substantial rights have been prejudiced in this way.

In the first instruction all the elements constituting the crime of murder were fully set out, except that the jury were only required to believe that "the defendants shot, wounded and killed John Mays, with a pistol or pistols," and the words, "that he died within a year and a day thereafter," or "presently" or "then and there died" were omitted, and complaint is made of this. It is true that an indictment must by equivalent terms show the death of the injured party from the effects of the alleged wounding, "within a year and a day," but in this case it is shown by all that the deceased died on the spot, and as there can be no issue as to time, the court did not err to defendants' prejudice in not forming such issue in the instruction.

The third instruction reads:

"If you believe from the evidence in this case beyond a reasonable doubt that the defendants or either of them have or has been proven guilty either of wilful murder as set out and defined in instruction 1, 4, & 5 or of voluntary manslaughter as set out and defined in instruction 2, 4 & 5, but shall have a reasonable doubt from all the evidence as to which offense the defendant, Joe Pearl Fuson or Walter Fuson, has been proven guilty of, then you will give them or either of them the benefit of the doubt and find them or him guilty of the lower offense, that of voluntary manslaughter, as set out and defined in instruction 2, and fix their punishment as set out and defined in instruction 2."

It is claimed that this virtually told the jury that they must fix the punishment of Joe and Walter the same. It might have made the instruction clearer for the words "or his" to have followed the word "their" in the last line, but in the other parts of the instruction Joe and Walter were each separately given the benefit of the reasonable doubt, and the rational construction throughout is that their liability was several and not joint. We do not think the jury could have misunderstood this or that the defendant was prejudiced thereby.

It is also urged that the fourth instruction on the question of aiding and abetting was erroneous, in that

it did not include the phrase, ''and that said shooting and killing of Mays was induced thereby.''

In some cases it has been held essential to include such language in an instruction for aiding and abetting. Powers v. Comlth., 110 Ky. 386; Hall v. Comlth., 29 Rep. 485.

In the Powers case the defendant was not present at the homicide, and the aiding and abetting referred to the formation of an alleged conspiracy and it is not in point.

The Hall case seems to be in point. However, in a great number of cases instructions similar to the one in this case and in which the phrase quoted was omitted have been approved. Watkins v. Comlth., 112 S. W. 658; Baskett v. Comlth., 19 Rep. 1995; Ward v. Comlth., 14 Bush 233; Steeley v. Comlth., 129 Ky. 524; Gambrell v. Comlth., 130 Ky. 532; Chadwell v. Comlth., 24 Rep. 818. Indeed, in the first two cases the instructions were prepared by this court, and it is also worthy of note that the same form of instruction is approved in Hobson on Instructions. Several different forms are there given but in all of which the phrase quoted is omitted. Hudson on Instructions, pages 988, 991, 994, 996.

The reasoning is clear; if one commits a crime and another is actually or constructively present aiding, abetting, assisting or encouraging its commission, the latter thereby becomes a participant—a principal in the second degree—and his culpability is determined by his motives and not by the degree of his influence over the former.

While somewhat involved we think on the whole the instructions were sufficiently clear to be understood by the jury and that the substantial rights of the appellants were not prejudiced thereby. As to whether the verdict is sustained by the evidence calls for a statement of the facts.

The homicide occurred about 100 yards from the Locust Grove church, near the line between Whitley and Knox counties, on Saturday night, September 2, 1922. Joe, Marna, Walter and Virgil Fuson are brothers, aged 23, 21, 20 and 14 years respectively, and Tom Fuson is their father. He and the older sons were engaged in farming and mining, and possibly some of them in bootlegging, all residing with their father, except Joe, who was married and living some four or five miles distant.

The deceased, John Mays, was deputy sheriff of Whitley county, and about three weeks previous to the homicide he had had some difficulty with Walter, and on the

Sunday previous had arrested both Joe and Marna on bench warrants. Marna's arrest was at home, his father and Walter being present. Marna rather resisted arrest and his father, Tom, caught the sheriff's pistol and refused to turn it loose. The sheriff summoned a bystander to assist, and at his command the latter struck Tom over the head with a pistol, inflicting a severe wound and causing it to bleed. Walter did not interfere. Finally Tom let loose and the arrest was effected. Joe learned of this a short time afterward; during the week a number of threats were made against Mays by Tom and Marna, the latter saying that he had told him (Mays) he would see him again when he had just as good a "special as he had and that he would make it smoky." Just shortly before the homicide he stated that he "would kill John and George Mays." On Monday before the homicide Tom Fuson told a party, "Dick, do you know that brother-in-law of yours is going to get killed, be killed inside of a week; the trap is set for him and it will work."

Again, on Friday he said to another, "John Mays had just as well be fixing his poplar overcoat, that he would give him until Christmas to live." Similar language was used by him on other occasions.

On Friday evening Joe went to his father's, but it does not appear what occurred at that time, but, after dark the following night, he and his other brothers named went to Locust Grove church to meeting, though none of them entered the building. John Mays was also there and it seems was ordained a deacon at the time. During the services the latter's 17-year-old son, George, had a difficulty with Virgil Fuson in which Virgil called him a son of a b— and George slapped him. After the meeting broke the deceased and his son started home, the latter using a broom stick as a cane, and on the road they encountered the Fuson boys.

According to the Commonwealth witnesses, Joe accosted George, saying, "If you ever bother this boy again, I don't care how big a crowd is around, when I get through there will be nobody left but me." Deceased told Joe to go on and behave himself, he wanted no trouble. In answer Joe struck him with his fist and deceased took the stick from George and struck Joe. At this moment Walter Fuson ran in and struck deceased with his fist and Marna, who was present, struck him with a stick. Deceased was fighting them off when Joe and Walter began shooting at him, they being a few feet dis-

tant and shooting him from behind, and the last shot was fired by Joe at a time when deceased was staggering away from him, and at this he fell and expired. The deceased was carrying a pistol in a holster under his arm and covered by the bib of his overalls. He did not have it out during the difficulty and it was afterwards found by the magistrate, who searched his body, which had not been disturbed from the time he was killed. It had six chambers, five of which were loaded, the hammer resting upon the empty chamber. It further appears that deceased received three bullet wounds, all entering from behind, two in the back and one in the head. Others testify to seeing different ones of the Fuson boys with pistols.

For the defense it was shown that Joe Fuson visited his father's family the previous evening and came to church that night to meet his wife, who had also gone to her father's in that neighborhood, but who did not go to church, and that the other boys also went to church. Some of them had heard of the trouble between George and Virgil, but they felt no grudge over that. They had no grudge against the deceased on account of the arrest of Marna, and they denied the threats proven. The same road led to the home of deceased and to that of their father. Joe and Virgil unexpectedly overtook John and George as they were crossing the branch, and Joe said to George "that it was a shame that there could not be a gathering but what there was crying among it between him and the little boys and that he wished that he would not do that any more. That he ought not to do that there, that if he wanted to fight he ought to get away from the church house."

John grabbed the stick from George and struck him on the arm, and tried to strike him in the face. He backed away and told John he did not want to have any trouble with him, and John hit him on the wrist and numbed it and struck him in the head and knocked him to the ground. He had to go through his shirt and jacket to get his pistol, which was in a shoulder strap under his arm. In the meantime Walter came up and John had knocked him down and was beating him with a stick. Joe requested him to stop and he did not and Joe fired. John kept on beating Walter and Joe fired again and still John did not stop and Joe stepped out of the smoke and saw him still following after Walter with the stick in his hand, and he fired the third shot, at which John

fell. There were no other shots fired and he fired each time in defense of Walter. He admits having been arrested by Mays on Sunday before, and that he had then learned of Marna's arrest and of the difficulty between his father and Mays, but that was not his affair and he bore no grudge over it.

Walter admits having trouble with the deceased about three weeks before. He was also present at the time Marna was arrested but did not interfere. He was thrown from a horse and badly injured a short time before and was not in a condition to interfere, and had not recovered at the time of the homicide. He had no pistol and all of the shooting was done by Joe. The first he knew of the difficulty John had knocked Joe down, and he started to pass them, doing nothing. John knocked him down and he tried to get away on his hands and knees but deceased pursued him, beating him on the head and body. During this time three shots were fired. His head was in a bad condition from his former wounds and he was so "addled" by the blows from John that he got home as quickly as possible and went to bed.

Marna claims that he had no pistol or stick; that he anticipated no trouble, but as he was going up the road in the darkness saw the fight when he come up on them. The first thing he saw Joe was getting up and John turned and struck Walter, who was doing nothing. He approached and without doing anything John turned and struck him with a stick and he ran away and knew nothing further about it.

Tom denies all of the threats attributed to him. He was at home and claims that he knew nothing of the difficulty. As affecting their credibility it was shown that Tom had served a term in the penitentiary and Joe in the house of reform under conviction for a felony.

There was other evidence introduced, but without going further into details or into a critical analysis, we are of the opinion that it was sufficient to submit the question of conspiracy upon the part of all the defendants. Consequently it was proper to instruct the jury on all the questions raised in the indictment. While numerically the evidence for the defense is rather strong that this was a sudden and unexpected affray on their part, the fact that they had had previous difficulties with the deceased, and the further fact that they had had numerous conferences succeeding the arrest on Sunday previous, the sanguinary nature of the difficulty at the time of that

arrest, together with various threats made by the different members of the family, the timely visit of Joe to his father's and the attendance of the four at this night meeting, according to the Commonwealth's witnesses, three being armed with pistols and the fourth with a stick, and the celerity with which they gathered at the place of the homicide, together with occurrences at that place, constitute sufficient evidence to sustain the verdict of the jury.

Perceiving no error in the record, each of the several cases is affirmed.