## Edmonds v. Commonwealth.

(Decided October 4, 1929.)

726

ECKERLE & SHUMATE for appellant.

J. W. CAMMACK, Attorney General, and JAMES M. GILBERT for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At about 11 p. m. on November 13, 1928, Harry A. Long, the night watchman at the Community Family Laundry, in Louisville, Ky., was murdered in the engine room of that establishment. Ten days thereafter (November 23, 1928) the grand jury of the county jointly indicted appellant, Richard Edmonds, John Keller, and James Grigsby, charging them with having committed the murder. The indictment was in four counts, the first

of which charged a joint murder, while the others charged each of the three as principals and the others as aiders and abettors. Each of the accused was arrested on the same night of the murder (and a short while thereafter), and had been in custody from thence to the date of the returning of the indictment. On the 18th day of December of the same year, there was a separate trial in Jefferson circuit court of appellant on that indictment, and the jury found him guilty and fixed his punishment at death. His motion for a new trial was overruled, and after judgment pronounced he prosecutes this appeal, and seeks a reversal upon four grounds, which are: (1) Error of the court in not continuing the trial to a future date; (2) that the court erred in overruling the demurrer filed by appellant to the indictment; (3) that the evidence was insufficient to sustain the verdict, and the court improperly overruled defendant's motion for a peremptory instruction; and (4) incompetent evidence introduced by the commonwealth at the trial—each of which will be considered and determined in the order named.

1. Ground 1 may be disposed of quickly. In the first place, no motion for a continuance was made upon any ground whatever. It is true that it is argued in brief that appointed counsel did not have time to prepare the case; but nothing is pointed out, in even that incompetent manner, to show wherein defendant's rights were in the least prejudiced by failure to postpone the trial. Not a witness was offered or testified for defendant at the trial, nor did he see proper to testify in his own behalf. The crime had been committed more than a month before the trial, and nearly a month had expired since the return of the indictment by the grand jury. Not an intimation is made in brief, much less in the record, that counsel was deprived of sufficient time to fully investigate the case, and to make all needful preparations for a trial of the indictment, and under such circumstances it would be folly to devote more time or space to the discussion of this ground, since what we have said overwhelmingly establishes its lack of merit.

2. Ground 2 is not argued in brief, but it is stated therein, in the introductory part thereof, that it is one of the grounds relied on for reversal. After making that statement no further reference is made to it anywhere in the brief, and under a long-followed rule of this court we would be authorized to treat it as abandoned; but be-

cause of the perilous situation of defendant we have closely scrutinized the indictment and cannot find the slightest fault with it. Without setting it out, or any portion thereof, we deem it sufficient to say that it completely conforms to the provisions of the Criminal Code with reference thereto, and in a manner that in numerous cases has been approved by this court. It would, therefore, be a waste of time to further pursue the discussion of this ground.

3. The disposition of ground 3 calls for a brief statement of the substance of the material facts as established by the only proof in the case, which, as we have seen, was that offered by the commonwealth. The appealing defendant was the fireman of the engine that ran the laundry, while, as stated, the deceased was its night watchman. At about 5 o'clock on the day of the homicide, appellant asked the superintendent and manager of the laundry to advance him $5 on his wages, and the latter consented to do so, and went to the safe in the office, which was always kept unlocked, and opened it, and then unlocked the middle drawer therein, in which there were some bills and smaller change, and he took therefrom $5 and handed it to appellant, who was standing close by and in plain view of the safe and the drawer. Some, if not all, of the paper currency was then or later taken from the drawer, leaving therein some silver coins of different sizes. The drawer was then relocked and the safe door closed, without locking it, and which acts were done in appellant's presence and under a glaring light.

Some two hours thereafter the three defendants met at some soft drink stand run by a colored person and they procured some whisky, of which they each partook. They were seen together at not only that but other places of resort operated by colored people, and a short while before the commission of the crime two members of the family of Bourbon Unseld, who lived within 30 feet of the laundry, the outside of which was well lighted, saw three persons near a parked automobile in the adjoining yard to the Unseld residence, and they were acting in such a manner as to arouse the suspicions of the two Unseld girls, who were under the belief that the three persons whom they saw at the automobile purposed stealing it, and they so informed their father, who was then asleep, but whom they awoke. After partially dressing himself he went down into his yard, but the parties

had left the automobile, and were not then seen by him and he returned to bed.

Within a brief space of time thereafter the same daughters of Bourbon Unseld discovered appellant, whom they knew, opening the outside shutter to the window of the engine room of the laundry, and two other men were standing close by. Appellant was recognized by those two witnesses, and after he peeped into the laundry through the window, the shutter of which he had opened, he closed it and went to the side door of the laundry, and beckoned the others to follow him, which they did. The two daughters again aroused their father, who immediately got up and went into the yard, where he saw some or all of the defendants, but in the meantime they had managed to open the door, and they then entered the laundry building, and almost immediately thereafter the two daughters and their father heard cries from the deceased, whose voice they recognized, and in which he was imploring ''Rich'' (appellant) to have mercy on him, and begging him to spare his life. Employing the exact expression of one of the witnesses, the exclamation from the deceased was, ''Rich, have mercy on me; please do not do that Rich; have mercy on me; somebody call the police.'' The father, Bourbon Unseld, upon hearing those remarks and having seen what he testified to, went to a telephone and called the police, but not, as we have said, until he had heard from the corner of his house the cries of the deceased, followed by silence and the leaving of the laundry by a side door by two persons, whom he did not at that time recognize, but whom he later recognized as the other two defendants in the indictment, after they were arrested that same night, and whom he also identified at the trial. He detailed some conversation between those two, and also some remark made by some one in the laundry, all of which was of a guilty nature, but which it is not necessary here to insert.

Charles Unseld, a son of Bourbon, had been to a picture show that night, and just after the exclamations of deceased he approached his father's dwelling, across the street from which was the laundry (about 30 feet distant), and he saw the other two defendants come out of the side door of the laundry, which was open, and heard a voice from the inside saying, ''Come back here; what is the matter with you; are you scared?'' The two that he saw on the outside then returned to the inside of the laundry. Within 30 minutes or slightly longer the police

arrived in response to the notification of Bourbon Unseld, and they found the body of deceased immediately in front of the engine, with his head crushed, as if struck with some hard instrument, and lying in a pool of blood. They also found the door to the safe open, as was also the middle drawer therein, which latter bore evidence of having been prized open with some instrument. Within two or three feet of deceased's body there was an iron poker stuck into the pile of coal, and which was used in firing the engine. Upon the end of it there was some kind of red liquid, which the witnesses were permitted to state was, in their opinion, blood.

When appellant was arrested there was found upon his person a quantity of small change corresponding to that left by the superintendent of the laundry in the middle drawer of the safe, when he went from the laundry that night. Later appellant signed a written confession, in which he told about his meeting with the other defendants at the places hereinbefore stated, and their buying and drinking some whisky, and then said:

"After drinking Jim Grigsby said, 'I need some money to pay rent.' I said I needed money for rent, too, and we called John Kelly outside and asked him if he wanted to go with us, and Jim asked if there was any money in the safe out there where I work, I said, 'Yes, there is a safe out there, but I don't think there is any money kept in it.' Jim says, 'Don't matter a damn if there aint but $2; that will help us out.' We then went to the Community Laundry at 412 St. Catherine, and I knocked on the door, and then on the window, and on the second window. Mr. Long then answered, and says, 'Who is there?' I answered, 'It is me, Mr. Long; it is Rich.' He opened the door and let me in, and I give him a drink out of the bottle, and Jim and John grabbed Mr. Long, and told me to get the hatchet, and I walked about five steps from them, and when I got back with the hatchet Mr. Long called me and says, 'Rich don't let them do me this way.' He was laying flat on his back in the boiler room, bleeding from the head. I walked out into the alley, and John and Jim called me back, and said, 'Come on back in here,' they said, 'I got him now.' We all three went to the office then, ransacked the office, broke the safe open, and took what money there was in the safe. I don't know how much money was in the safe. As we left the office,

we divided by nickles, pennies, as we walked along. I had about $1.50 for my part."

Other witnesses besides the one who transcribed the confession testified to its contents, and it is denied by no one. No fact was introduced, or developed by cross-examination of the commonwealth's witnesses, to impeach the verity of that confession, or to render it incompetent under our statute, commonly known as the "sweating" statute, and under numerous opinions of this court it must be admitted as competent.

Under the evidence, as we have so briefly, but substantially, outlined it, it is extremely difficult for us to understand the contention made as a foundation for this ground. It is said in brief in support of it that the commonwealth did not prove that the killing was done with the poker found near deceased, nor that, if true, appellant ever had the poker in his possession, or used it for the purpose of killing deceased, or in any other manner on the fatal occasion. But surely counsel is not serious in those contentions, since the other testimony in the case created, perhaps, as strong grounds for the inference of such guilty facts as if they had been testified to by eye-witnesses, and it is almost always the case that some such guilty facts are inferred by the jury from other conclusive circumstances justifying such an inference. We could insert cases from this and other courts, as well as text-writers, in support of that statement, that would fill multiplied pages of this opinion, were it necessary to do so, and we cannot believe that counsel, divorced from enthusiasm for their client's cause, would seriously make this contention.

4. The incompetent evidence complained of under ground 4 consisted in the opinions of the witnesses that the substance they found on the iron poker was blood. They described it, and we think they were competent, at least after such description, to give their opinions as to what it was. But, whether so or not, this homicide had been committed by some one, and whether it had been done with the iron poker, a hatchet, or other instrument, is, under the language of the indictment, immaterial, and it is apparent that the objection as to this item of evidence is entirely without merit.

It is next insisted in support of this ground that it was incompetent for the commonwealth to prove the advancement to appellant of the $5, hereinbefore mentioned, some six hours preceding the homicide. But

clearly counsel overlooks the fact that the purpose of that testimony was to establish a motive for the killing (i. e., that of robbery) by carrying home to appellant, not only knowledge that the drawer in the safe contained some money, but the further fact that the safe was left unlocked, and under all rules of criminal practice the evidence was clearly competent for the purpose and was properly admitted.

The last complaint under this ground is that the court erred in permitting proof of the money found upon the person of appellant when he was arrested. That testimony did not identify the money so found with that left in the safe the night of the commission of the crime, but the denominations and character of coin were similar to the ones so left in the safe, and the evidence was clearly competent, though, perhaps, of but little value.

We have considered the points argued for reversal at what we are convinced was an unnecessary length, because of the gravity of the case. Our discussion of them will at once convince a layman, much more a member of the profession, of their utter lack of merit. Our duty could have been performed by writing a much shorter opinion, but on account of the severity of the punishment we concluded to make a full presentation of the case in the opinion, and from which it is clear that appellant has had a fair and impartial trial. Mr. Long was ruthlessly assassinated. Positive and convincing testimony connects appellant with its commission, and, eliminating his confession, the testimony fastens the crime on him individually. The death penalty was provided to fit such a case, and no court is authorized, however mercifully it may be inclined, to disturb it, when inflicted by the jury under such circumstances.

Being so convinced, the judgment is affirmed. Whole court sitting.