## Carter v. Commonwealth.

(Decided April 23, 1935.)

H. C. KENNEDY, J. C. DAVIS and E. BERTRAM for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

From a judgment sentencing him to the state reformatory for life for the crime of murder, Clyde Carter appeals, insisting his motion for continuance was improperly overruled; the court failed to give the jury the whole law of the case and improperly failed to admonish the jury as to the purpose of certain testimony.

To support the motion for continuance, he filed affidavits of himself and attorneys. In his original affidavit he states in detail the time and place of the commission of the crime; hostile demonstrations toward him of a brother of the deceased, "and that he had been greatly grieved ever since (the killing) and in no frame

of mind to assist his attorneys in preparing his defense and that he is not now in such frame of mind as to justify his entering on the trial of the case, and that * * * he is unable to properly assist his attorneys in the conduct of his defense." In a supplemental affidavit he names seven individuals and declares each is a material witness, but that he did not know they were material witnesses until the morning the prosecution was called for trial, and did "not know and unable to state what their testimony would be and that neither he nor his attorneys had had time or opportunity to consult them." As soon as he learned they were material witnesses, he had a subpœna issued for them and delivered it to the sheriff for execution. Two of the witnesses named in the affidavit were summoned; one testified in his behalf, the other did not. The affidavit of his counsel merely explains the killing occurred on the night of November 10, 1934, "somewhat less than two weeks ago," since which time the accused had been in jail and they had been pressed with other legal business. They had information of rumors in connection with the killing, the truth of which they had not had time to investigate, to enable them to be ready for trial at that term of court.

Section 11 of our Bill of Rights guarantees an accused the right to be heard by himself and counsel, which includes the coordinate right to sufficient opportunity and time to enable him and his counsel properly to prepare and present his defense. McDaniel v. Commonwealth, 181 Ky. 766, 205 S. W. 915; Piercy v. Commonwealth, 195 Ky. 725, 244 S. W. 52. It is the purpose of the Constitution and the law that in every criminal prosecution each side shall be given a fair hearing. To this end, it is of greater importance for justice to be certain and sure, than that a trial shall be speedy. Fuson v. Commonwealth, 199 Ky. 804, 251 S. W. 995. In every case where a motion for continuance is made by an accused, based upon the absence of a material witness or witnesses, it must be supported by an affidavit of the accused or another, showing the steps that had been taken to procure the attendance of the witnesses, the substance of the testimony expected to be proven by each, if more than one, its materiality; that they are within the jurisdiction of the court; the facts he can prove by each witness are true; and that each of them is absent without his consent or procure-

ment.  See section 189, Criminal Code of Practice, and
section 315, Civil Code of Practice; Benge v. Common-
wealth, 92 Ky. 1, 17 S. W. 146, 13 Ky. Law Rep. 308;
Rogers v Commonwealth, 188 Ky. 817, 224 S. W. 348;
Belcher v. Commonwealth, 216 Ky. 126, 287 S. W. 550.
Where the affidavit conforms to this rule, it is the duty
of the court to grant the continuance, unless the attor-
ney for the commonwealth admits that such absent wit-
ness or witnesses would, if present, testify as alleged in
the affidavit, in which event the accused may read it as
the deposition of the absent witness or witnesses, sub-
ject to irrelevancy and incompetency; "provided, how-
ever, the court may, when, from the very nature of the
case, it shall be of the opinion that the ends of justice
require it, grant a continuance, unless the attorney for
the commonwealth will admit the truth of the matter
which it is alleged in the affidavit such absent witness
or witnesses would testify to."

Carter's affidavit fails to meet these requirements,
in that it does not contain the purported testimony of
the absent witnesses.  The absence of this statement is
attempted to be explained with the statement that he
had received, on the morning of the call of the case, in-
formation of not only their names, but what they would
testify, if present, and that they were "each a material
witness for him."  Supporting this statement, his coun-
sel in their affidavit claim they had received information
concerning certain rumors, the truth of which they had
not had time to investigate.  Accepting, without decid-
ing the sufficiency of, the explanation of his failure to
embrace in his affidavit that which he expected to prove
by the named witnesses as a sufficient compliance with
these requirements, we are not convinced that the court
erred in overruling his motion for a continuance.

The granting of a continuance, in the circum-
stances, was within the sound discretion of the court
(Commonwealth v. Carnes, 124 Ky. 340, 98 S. W. 1045,
30 Ky. Law Rep. 506; Owen v. Commonwealth, 181 Ky.
257, 204 S. W. 162); but this discretion did not author-
ize a refusal of the continuance if the circumstances
showed that justice to him required it (Samuels v.
Commonwealth, 154 Ky. 758, 159 S. W. 575).  In de-
termining whether the circumstances required it, it was
within the discretion of the court to determine the suf-
ficiency of the grounds for continuance which, of course,

depended upon the circumstances of the case. Jamerson v. Commonwealth, 230 Ky. 704, 20 S. W. (2d) 711.

It is true that we have ruled in certain cases that the trial court erred in refusing to grant a continuance on account of the absence of a witness or witnesses, as well as where the accused had not been granted sufficient opportunity or time to prepare for trial. Samuels v. Commonwealth, supra; Allen v. Commonwealth, 168 Ky. 325, 182 S. W. 176. It is equally as true that in others, on the facts therein, we have declined to reverse on either of these grounds. Fletcher v. Commonwealth, 210 Ky. 71, 275 S. W. 22; Boreing v. Commonwealth, 211 Ky. 474, 277 S. W. 813; Harris v. Commonwealth, 214 Ky. 787, 283 S. W. 1063; McQueen v. Commonwealth, 224 Ky. 89, 5 S. W. (2d) 487; Edmonds v. Commonwealth, 230 Ky. 725, 20 S. W. (2d) 745; Carsons v. Commonwealth, 243 Ky. 1, 47 S. W. (2d) 997, 1000. The rule is, where it does not appear that the accused could better his defense if it were granted, a refusal of a continuance on the ground of absent witnesses, or that he had not had time to prepare his case, is not prejudicial. See Harris v. Commonwealth and Carsons v. Commonwealth, supra.

"The record of the trial of the case conclusively shows that all persons who were in a position to have any information concerning, or connected with, the shooting and the killing" the accused's victim "were introduced as witnesses, either for the commonwealth or" the accused. Carsons v. Commonwealth, supra. It is apparent, therefore, that a continuance for the purpose of "ascertaining" that of which the witnesses named in his affidavit might have knowledge would have afforded no material benefit or advantage to his defense. Carsons v. Commonwealth, supra. Also see Harris v. Commonwealth, supra.

It cannot be reasonably insisted that the trial court abused that discretion which the law vested in him in the overruling the motion for a continuance, since the record discloses all persons who had information or opportunity to have information of any facts or directly or indirectly connected with the commission of the crime for which he was tried were present at the trial and testified. We are convinced that the court properly overruled his motion for continuance.

It is true it is the duty of the court correctly to

give the whole law applicable to the case, though it may not be asked; nor need an exception be taken by the accused to any instruction given in order to save his right to have his criticism of it reviewed by this court. Commonwealth v. Louisville & N. R. Co., 175 Ky. 250, 194 S. W. 303. Also, "when no witness introduced on the trial saw the homicide committed, or saw the parties after they met on the occasion when the killing occurred, the law applicable to murder, manslaughter, and self-defense should be given, in order to meet any state of fact the jury may find, from the circumstances in evidence, to have existed." Rutherford v. Commonwealth, 13 Bush, 608; Farris v. Commonwealth, 14 Bush, 362; Ratliff v. Commonwealth, 182 Ky. 246, 206 S. W. 497. The rule is to the contrary where the defendant testifies, denying his participation in the crime (Crenshaw v. Commonwealth, 227 Ky. 223, 12 S. W. [2d] 336), or testifies that he was an eyewitness as to how the homicide occurred. and his testimony is consistent with his innocence. The reason which we have approved as a justification for the rule requiring instructions on all degrees of the crime, including self-defense, does not exist where the defendant, himself, testifies, explaining or denying his participation in the commission of the crime. And it is a familiar principle of law that when the reason ceases, the rule ceases. Frasure v. Commonwealth, 169 Ky. 620, 185 S. W. 146; Wellington v. Commonwealth, 158 Ky. 161, 164 S. W. 333; Justice v. Commonwealth, 46 S. W. 499, 20 Ky. Law Rep. 386. Also, if the evidence shows the crime was murder, and the only question is whether the accused is guilty or innocent, there is no call for instructions on the different degrees of homicide. Mackey v. Commonwealth, 80 Ky. 345; Bullock v. Commonwealth, 249 Ky. 1, 60 S. W. (2d) 108, 94 A. L. R. 407. There is no rule making it the duty of the court in every case of homicide to instruct as to murder, manslaughter, and self-defense. The instructions should be based upon the evidence and given to suit the case in hand. Payne v. Commonwealth, 255 Ky. 533, 75 S. W. (2d) 14. No fact or circumstance was proven herein upon which to base a self-defense instruction. Therefore, the court properly omitted it.

No criticism is presented to the given instructions. The accused only insists that he is entitled to the rule "of the whole law of the case," on the theory there was

no eyewitness present at the time the crime is charged to have been committed. This insistence overlooks the fact that the accused, himself, testified, declaring the killing was the result of an accidental discharge of a pistol in his hands, under circumstances entitling him to an acquittal. Clearly, on the facts as testified to by him, he was not entitled to an instruction on self-defense.

A consideration and disposition of the evidence objected to by him require a review of that in behalf of both the commonwealth and the accused.

The accused lived at the home of his father, a mile and a half west of the city of Monticello. Ocie Mae Burk lived near the city. The accused's mother, on the night of the tragedy, was conducting a restaurant at Monticello, where he seems to have been engaged as a helper. He was unmarried; had been acquainted with Ocie Mae ever since she was a small girl. He had been "going with her" for about three months; visiting her at her home and elsewhere. She had been visiting at Indianapolis and New Castle, Ind., until the night before she was killed. In his automobile the accused called at her home about 5 p. m. for the purpose of making an engagement to visit her that night. She consented. About 6:30 he returned to her home. At that time she was alone in the living room. On his arrival he sat in a small chair in front of the fire in the living room. He remained a few minutes, when Fred Burk, a brother of Ocie Mae, desired to go to town, and requested the accused, and he consented, to carry him in the latter's automobile to Monticello. Later, he returned to the home of Ocie Mae. After he had returned, Charlie Burk and Helen Burk, a brother and sister of Ocie Mae, came into the room and remained "just a few minutes." After talking a few minutes, Charlie left the room and departed for town. Helen continued to pass in and out of the room, leaving alone Ocie Mae and the accused. The room occupied by them adjoined that occupied by the father and mother of Ocie Mae, where an older sister remained for a portion of the time, until the killing occurred. A radio was in the room where Ocie Mae and the accused were. The father came into the room, "turned it on," and returned to the room from whence he came, leaving the door ajar. He sat near the door between the room occupied by him and his wife and that in which were Ocie Mae and the accused. Some

one closed the door; the father again opened it, and again it was closed. The father was sitting near enough to the door between the rooms to open it without arising from the chair. The mother of Ocie Mae was sitting near him in front of the fire. Helen, on one of the trips into the room where Ocie Mae and the accused were, claims that the accused offered her a dime to tell him who had been "going with" her sister, Ocie Mae. She also claims that she left the room about three minutes before the shot was fired and at that time Ocie Mae was sitting in a chair and the accused on the arm of the same chair. She claims that after she left at that time she went into a room adjoining that occupied by Ocie Mae and the accused, and was in the act of placing a magazine on a shelf at the time the shot fired and as it fired she opened the door and observed the accused throw a pistol "in the corner"; he had one arm extended, and Ocie Mae was in the act of going to the door which her father opened about that moment. The mother claims that immediately before the shot was fired she heard as many as three footsteps in the room in which were Ocie Mae and the accused. The father claims that he heard Ocie Mae and the accused "quarreling and talking loud," and he was "just ready to get up" and "go in there and see what was wrong, and just about that time the gun went off." The radio "was not going" at the time. He claims instantly on the sound of the shot he reached the doorknob, turned it, and opened the door and at that moment Ocie Mae had reached the door and was in the act of falling. He ran into the room and exclaimed, "What in the name of God has happened! How did this happen?" When the accused responded, "Ocie Mae shot herself," the accused pointed to where she was hit. Immediately the father charged him with killing her. Ocie Mae fell to the floor in front of the door and the father and the accused picked her up and laid her on the bed. Again the father charged him with killing her; he stated, "I shot her accidentally." After Ocie Mae was placed on the bed, her father asked her if she knew him. Her response was, "Uh-hu." Then he asked her if Clyde had shot her. Again she responded, "Uh-hu." The father ordered the accused to leave, which he did. Dr. Rice was immediately called, arriving within about fifteen minutes, and thereafter Ocie Mae died within about forty minutes. The ball entered "below the left shoulder blade" and "ranged a little up."

The accused stated no unpleasantness or quarreling occurred between him and Ocie Mae. Helen had left the room "just a few minutes" before the shot was fired; she closed the door as she went out; he had a pistol in his car and could not lock the door to it, and Ocie Mae, on being so informed, said he "had better bring it in, somebody would steal it," which he did. He had no whisky that night. Charlie Burk had it and the two of them took a drink of it, but he was not under the influence of whisky. After Helen left the room, the pistol was in the chair and he decided he had better move it, when Ocie Mae wanted to "look at it." He suggested to her to wait until he unloaded it, which he did, taking out three shells, then gave it, and the shells to Ocie Mae. She played with it in front of the fire; snapped it fifteen or twenty times. He describes the happening thus: I was "sitting on the arm of the chair," occupied by her, reading a magazine; "somebody stepped" to the door and Ocie Mae said, "Take the pistol," and I grabbed it and it went off. "It discharged as I took hold of it." "I didn't pull the trigger." "I didn't have hold of it." He stated that he did not know how or when it had been reloaded; or know whether it was cocked when she handed it to him. At the time she handed it to him, she was sitting in the chair about ten inches below the arm of it on which he was sitting and they occupied this position at the time she reached the pistol to him over her shoulder when it fired as he took hold of it. He claims, when the pistol fired, Ocie Mae "pitched over" and he reached and grabbed her. He admitted he stated to a sister of Ocie Mae, "You know I didn't do it on purpose." After he was ordered away, he returned to his mother's restaurant and directed her to call Dr. Rice, which she did, but was unable to get him; then he sent Logan Rankin after the doctor. Soon thereafter he was arrested. At that time "only one shell was in the pistol." The mother of Ocie Mae claims she found another in the room where the shooting occurred. Two or more associates of Ocie Mae and the accused were permitted to testify that on two or more occasions, when they were making a trip with Ocie Mae and the accused, the latter were "fussing about something." On one occasion, while riding in an automobile, Ocie Mae tried to get out the door of the car, when the accused took hold of her arm and slapped her in the face, and she began to cry. Other minor statements of their conduct toward each

other on certain trips were narrated by the same witnesses. The accused objected to the introduction of this line of testimony. The court overruled his objection. He then moved the court to admonish the jury "not to consider that part that had reference to previous trouble." The court overruled this motion.

He here complains of the ruling of the court as to this testimony. The motion to admonish the jury admits its competency for the purpose for which it was admitted. It tends to shed light on the relations, and the mental attitude toward each other, of the accused and Ocie Mae, and was, therefore, clearly competent for that purpose. Technically, probably the court should have admonished the jury of the purpose for which it was admitted. It is apparent that the jury knew it was not trying the accused therefor without an admonition of the court as to the purpose for which it was admitted. Conceding the court improperly overruled the motion, it is not doubtful that the error thus committed, if any, was harmless within the purview of section 353, Criminal Code of Practice. His ruling thereon was not prejudicial to the accused's substantial rights. Bowlin v. Commonwealth, 195 Ky. 600, 242 S. W. 604; Hill v. Commonwealth, 191 Ky. 477, 230 S. W. 910; Hendrickson v. Commonwealth, 235 Ky. 5, 29 S. W. (2d) 646; Jones v. Commonwealth, 235 Ky. 20, 29 S. W. (2d) 648. Minor errors not affecting the accused's substantial rights are never ground of reversal. Indeed, sections 340 and 353 of the Criminal Code deprive us of the power to reverse a judgment of conviction on such ground. Hamilton v. Commonwealth, 230 Ky. 207, 18 S. W. (2d) 995; Mullins v. Commonwealth, 230 Ky. 624, 20 S. W. (2d) 442; Browder v. Commonwealth, 232 Ky. 500, 23 S. W. (2d) 940; Howard v. Commonwealth, 234 Ky. 45, 27 S. W. (2d) 410; Shepherd v. Commonwealth, 236 Ky. 290, 33 S. W. (2d) 4. In determining whether a reversal is authorized under these Code provisions, it must be determined from the entire record whether the accused has had a fair trial. Hunt v. Commonwealth, 240 Ky. 293, 42 S. W. (2d) 315. It is only where a fair and impartial trial has not been accorded the accused that we are authorized to reverse an adverse judgment and grant a new trial. Abney v. Commonwealth, 251 Ky. 358, 65 S. W. (2d) 71.

The verbal testimony of the witnesses, the proven physical facts and circumstances are strongly convinc-

ing that the accused intentionally shot the deceased, though his testimony, had it been accepted by the jury, proved an accidental, unintentional killing. On such conflicting evidence, it was exclusively for the jury to determine the degree of his guilt and fix his punishment. It accepted the evidence of the commonwealth which is amply sufficient to sustain his conviction. We are not permitted to substitute our judgment on the facts for that of the jury. However much inclined we might be, in the circumstances, to bestow our benediction upon him, in the absence of some substantial error appearing in the record, prejudicial to his substantial rights, we are not authorized to interrupt the jury's verdict.

The judgment is affirmed.