## Hood v. Commonwealth.

October 25, 1946.

As modified on denial of rehearing Feb. 4, 1947.

Larimore & Craddock and Thompson & Walden for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

Opinion of the Court by Judge Thomas—Affirming.

The grand jury of Metcalfe County at the regular March, 1946, term of the circuit court indicted the appellant, Mitchell Hood, accusing him of the crime of grand larceny by stealing a power or chain saw, the property of E. C. Pulliam, which had been deposited by the owner in a wood shed behind a restaurant that he operated in the town of Edmonton. At his trial appellant was convicted and given the minimum penalty of confinement in the penitentiary for one year. His motion for a new trial was overruled followed by this appeal.

There are six alleged errors set out in the motion for a new trial, but only two of them are argued on this appeal by appellant's counsel, the other four being rightfully and properly abandoned as immaterial because wholly unsustained by the record. The two alleged errors argued in counsel's brief are (1) that the verdict of guilty is not sustained by the evidence, and (2) that the court should have granted a continuance of the trial. They will be the only grounds considered in this opinion.

The record discloses that appellant had not only been indicted for stealing the chain saw of Pulliam, but also that he had been indicted in the same court jointly with one Kirgan for stealing some automobile tires from Huber & Huber, but just when that indictment was found, or the crime committed, is not disclosed by the record, but it had been tried and the appellant convicted at the time the instant prosecution was called for trial. The only affidavit of appellant, and also that of his counsel, Larimore & Craddock, filed in this record, related to the trial of the indictment accusing appellant and Kirgan of stealing the automobile tires, there being no affidavit filed, so far as the record shows, for a continuance of this prosecution. If, however, the affidavits of appellant and his Munfordville counsel should be considered as supporting the motion for a continuance in this instant prosecution (for which there is some indication in the record supporting that conclusion), then under repeated rulings of this court, as hereinafter shown, the court did not err in overruling the motion.

Pulliam testified, and no one denied it, that the stolen saw had attached to it as a part of it some kind of

motor power which operated it when in use. Some small part of it became broken after three months' use from the time it was purchased, and while waiting to replace the broken part, or to mend it, Pulliam stored it on November 1, 1945, in the wood shed from which it disappeared. He stated that he did not discover that it had been stolen or removed until November 10, when he offered a reward of $200 for its recovery, it then being worth $500, as he testified, and which was not denied. The disappearance of the stolen article immediately became circulated in the neighborhood which brought about speculation and talk.

Appellant operated a truck, and he and his wife, together with the latter's brother, one Hill, resided on a farm near Edmonton, known as the Hill farm. Appellant's wife and her brother owned the farm by inheritance, but the brother exclusively operated it.

Before the trial appellant had been indicted and convicted of two different felonies. Morris Grissom testified for the Commonwealth stating that he had used the saw before it disappeared, and after it became broken, he stored it in the shed from which it was taken. He stated that following its storage he had a conversation with appellant who asked him how the saw operated and how fast it would cut, and that in one conversation he (appellant) talked about the broken piece and stated that he could make one; that appellant in the same conversation asked witness if he would give $100 for the saw to which witness gave a negative answer. This conversation took place before an inquisition was held for the purpose of discovering the property, as well as the one guilty of removing it, and which, of course, was before the saw was recovered on November 20 of the same year.

Another witness for the Commonwealth was Lawrence Coleman, who testified that before the returning of the indictment and after the saw had been taken from the wood shed appellant stated that "he had a pretty good idea where it was" and he then said to the witness, "You know where it is too," which latter the witness denied. The witness went with the sheriff and others on a search for the saw which was found hidden in a clump of bushes partially covered with honeysuckle

vines on the farm upon which appellant resided, some four or five hundred yards distant from the residence.

Pulliam further testified that after the property was stolen appellant came to his house late one night and that "He wanted to know how I felt about that saw." Witness then testified, after being asked to tell what happened, that:

"A. He said, 'You know I didn't get it and I've been to Bowling Green talking to a close friend, Mr. Adams, and he said, 'If you'll drop this, I'll pay you the $200.00 reward out for the saw.

"Q. Did you have $200.00 reward out for the saw? A. I did.

"Q. Tell the jury what he said in reference to that saw or in reference to dropping this prosecution? A. He said I had got my saw back and asked if I would be willing to drop it if he would pay the reward.

"Q. How much did he say he would pay? A. He said he would pay the $200.00."

Witness then stated that the man, Adams, referred to in that conversation was a detective living at Bowling Green and was the one who had held the inquiry referred to. Adams, the sheriff of the county, the witness Coleman and one or two others testified to the finding of the saw in the place hereinbefore described and delivering it to its owner, Pulliam. Appellant in his testimony denied the above statements attributed to him by the witnesses, Grissom and Coleman, but he admitted the one had with Pulliam with reference to offering to pay the latter the $200 reward that he had paid for the recovery of the stolen property, his testimony on that point being:

"Q. Did you talk to Mr. Pulliam about this matter? A. Yes, about a week or ten days ago. I don't know the certain day I did talk to him. They had a tale out that I had threatened Mr. Pulliam's life and that he was packing a gun for me and I asked him his personal feeling toward me and I told him I had no hard feeling.

"Q. Where did that occur? A. In front of Mr. Pulliam's restaurant.

"Q. You heard they were blaming you with this? A. Yes.

"Q. In that conversation did you tell him that you had rather pay his detective bill of $200.00? A. Yes, sir, I told him that he charged me with stealing the saw and I had rather pay $200.00 than to be in Court over it.

"Q. Did he tell you what the bill was? A. $200.00.

"Q. He didn't take it? A. No."

Defendant then denied his guilt of the offense with which he was accused.

There was a space of ten days from November 1, 1945, to November 10 when the saw was missing from the wood shed in which it had been stored. Appellant attempted to prove an alibi by accounting for his whereabouts on November 6, 1945, which was the regular November election day in this Commonwealth and on which he said he was engaged in hauling voters to the polls. He then stated that in the afternoon of that day he went to Beaver Dam to get a truck load of coal for a church organization in Edmonton, returning the next day sometime in the forenoon, but he positively stated that he did not know where he was on the day or night of November 8, nor was he asked or testified to his whereabouts on the 9th or any part of the 10th of November before it was discovered that the saw was missing. In the only affidavit that he made for a continuance (which was done in another prosecution) he gave the names of some witnesses at Beaver Dam to prove that he was there when he obtained his truck load of coal on the night of November 6, and which the court permitted to be read as the testimony of those witnesses. He did not offer any witness—not even his brother-in-law who lived with him—to testify in his behalf as to the existence of any defensive fact, alibi or otherwise, except Herbert Hood, a half-brother, Raymond Moser, a relative, and Hobert Wilburn. Herbert Hood testified that appellant spent the night of November 5 at his father's house as did also the witness. The witness, Moser, testified to the same fact, and the witness, Wilburn, testified that he was at the home of appellant's father in the early part of the night, and when he left for his home appellant, with the other witnesses, was still there, but he did not know where appellant spent the remainder of the night.

It will therefore be seen that appellant only attempted to prove his alleged alibi, for but two nights and one day out of the period of ten days intervening between the deposit of the saw in the wood shed and the day its disappearance was discovered and one of the nights was before the saw was stored in the shed. Therefore, if the two alibis appellant attempted to establish should be admitted as true, it still appears that the other testimony in the case was abundantly sufficient to submit the case to the jury and to support its verdict.

The continuance was asked mainly upon the ground that the firm of Larimore & Craddock was not employed until after the indictment was returned, and that, although they had consulted with their client some few days before the trial they insisted and made affidavit in another prosecution to the effect that they had not been employed sufficiently long to prepare for the trial; but they urged nothing nor suggested any defense of which they had the remotest intimation and for the development of which they needed more time. Neither did appellant in the affidavit he filed in the same different prosecution do so, except as to the witnesses at Beaver Dam to which we have referred, and whose testimony as set out in the affidavit, was read to the jury.

A similar motion made under similar circumstances was urged by appellant in the case of McDaniel v. Commonwealth, 246 Ky. 688, 56 S. W. 2d 340, 342, where the accused had been found guilty of murder and given a life sentence in the penitentiary. The refusal to grant the continuance was strongly urged on appeal to this court, but the court's action in overruling the motion was affirmed, and in doing so we said:

"It has been uniformly held by this court that the granting or refusing a continuance is a matter within the discretion of the trial court and such discretion will not be interfered with unless it is clearly made to appear that it has been abused. Brandriff v. Commonwealth, 227 Ky. 389, 13 S. W. 2d 273; Jamerson v. Commonwealth, 230 Ky. 704, 20 S. W. 2d 711; Holmes v. Commonwealth, supra (241 Ky. 573, 44 S. W. 2d 592).

"This court has consistently recognized that the right of one standing accused of a crime to be represent-

ed by counsel carries with it the right of himself and counsel to have reasonable time to prepare for trial. But there is no showing here that delay would have been of any advantage to appellant or to his counsel in preparation of his defense, and, in the absence of such showing, it is manifest that the court did not err in overruling the motion for continuance."

The same holding was made in the case of Carter v. Commonwealth, 258 Ky. 807, 81 S. W. 2d 883, 885, and after citing a number of prior cases the opinion said:

"* * * The rule is, where it does not appear that the accused could better his defense if it were granted, a refusal of a continuance on the ground of absent witnesses, or that he had not had time to prepare his case, is not prejudicial. See Harris v. Commonwealth (214 Ky. 787, 283 S. W. 1063) and Carsons v. Commonwealth, supra, (243 Ky. 1, 47 S. W. 2d 997, 1000)."

The measure of the trial court's authority in granting or refusing continuances in both criminal and civil cases is the exercise of a sound discretion under the facts and circumstances of the particular case, and a refusal to sustain such a motion will not be considered as an abuse of the court's discretion "unless it is clearly made to appear that it (court's discretion) has been abused." McDaniel case, supra. So far as the argument of insufficient time for foreign counsel to prepare their client's defense after being employed by him goes the record discloses that the local firm of Thompson and Walden was also counsel for appellant. It is not shown when they were employed or consulted, but it is fair to presume that some sort of charge had been made following the discovery of the stolen property on the farm upon which appellant resided which was, as we have said, on November 20, 1945, and appellant admits in the conversation with Pulliam that he offered to pay the reward for the recovery of the stolen property. It would therefore appear that an opportunity existed to investigate and prepare for the trial long before the indictment was found. Under the authorities supra, we conclude the court did not abuse a sound discretion in overruling the motion for a continuance.

The judgment is affirmed.